**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0668n.06
Filed: September 7, 2007

**No. 06-5695**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| ANDREA WILLIS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MIKE NEAL, Individually and as Sheriff of | ) | ON APPEAL FROM THE UNITED |
| Rhea County, Tennessee; JOHN ARGO, | ) | STATES DISTRICT COURT FOR THE |
| Individually and as a Member of the Rhea | ) | EASTERN DISTRICT OF TENNESSEE |
| County Sheriff's Department; RONNIE | ) | |
| HITCHCOCK, Individually and as Sheriff of | ) | |
| Sequatchie County, Tennessee; CLINT | ) | |
| HUTH, Individually and as Police Chief of | ) | |
| Dunlap, Tennessee; JAMES OLLIE | ) | |
| McMILLON, also known as James Ollie | ) | |
| McMilian, also known as James Ollie | ) | |
| McMillion, Individually and as a Member of | ) | |
| and Agent for Rhea County, Tennessee, | ) | |
| Member of Dunlap City Police Force & | ) | |
| Sequatchie County, Tennessee Sheriff's | ) | |
| Department; RHEA COUNTY, TENNESSEE; | ) | |
| CITY OF DUNLAP, TENNESSEE; | ) | |
| SEQUATCHIE COUNTY, TENNESSEE, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

**Before: ROGERS and COOK, Circuit Judges; and DOWD, District Judge.[*]**

---

[*]The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District of Ohio, sitting by designation.

No. 06-5695
*Willis v. Neal, et al.*

**Rogers, Circuit Judge.** Andrea Willis appeals the grant of summary judgment to defendant law enforcement officers and their respective municipal employers on her § 1983 claim based on allegations that Willis was arrested without probable cause and on her state law claims of outrageous conduct and false arrest. Willis's arrest was supported by probable cause, thus shielding the officers and municipalities from liability. The district court also properly considered Willis's claims of outrageous conduct and false arrest. Therefore, the grant of summary judgment was proper.

## I. Background

In 2003, Andrea Willis was a pilot working in Florida and attempting to accumulate enough flying hours to become a commercial airline pilot. It was through her job at the airport that Willis met Jack Marshall, another pilot. Willis often flew with Jack Marshall. On October 6, 2003, Jack asked Willis to accompany him on a flight to Dayton, Tennessee, scheduled for the next day. Willis, needing additional hours, agreed. The next morning, October 7, 2003, Willis boarded the plane with Jack Marshall, Jack's son John Marshall, and Danny Robertson. According to Willis, she understood the purpose of the trip to be related to John's involvement in setting up a pawn shop. Unfortunately for Willis, however, John was actually traveling to Tennessee for what he thought was a money laundering deal, but that was really an undercover operation of the 12th Judicial District Drug Task Force involving police informant James McMillon. McMillon had the role of bringing cases to the attention of the Task Force and he received 20% of whatever was seized as a "referral fee." While working as a informant for the Task Force, McMillon and John Marshall had concocted a money laundering scheme in which John Marshall would provide jewelry in exchange for

$287,000. This exchange was arranged to take place at the Dayton, Tennessee airport on October 7, 2003. John Marshall told McMillon that Robertson and his father, Jack Marshall, would accompany him and that his father's girlfriend might also be on the plane. When McMillon attempted to get more information from John about who would be on the plane, John said that everyone on the plane knew to keep their mouths shut. John Marshall also indicated that he would be armed.

Ricky Smith and Roy Sain, the Director and Assistant Director, respectively, of the Task Force, enlisted law enforcement officers from the City of Dunlap, Sequatchie County, and Rhea County, to assist them in the "takedown" at the airport. On October 5 or 6, Smith requested assistance from Dunlap Police Chief Clint Huth. Chief Huth was unable to enlist other officers, but agreed to assist the Task Force. Smith also called to request assistance from Sequatchie County Sheriff Ronnie Hitchcock. Sheriff Hitchcock assembled a group of four Sequatchie County deputies to assist the Task Force operation. On October 5, Smith contacted Rhea County Sheriff Mike Neal, who in turn contacted Chief Deputy John Argo. Argo assembled a team of several Rhea County deputies to assist the Task Force.

On October 7, 2003, the morning of the takedown, Smith conducted a briefing for the Task Force participants, telling the attendees that a plane would be flying into the Dayton airport and telling them about the money laundering scheme. Smith told the participants that several people would be on the plane, and that one of the suspects on the plane might be armed. The participants were divided into two teams. One team was to secure the individuals getting off the plane, while the

other team was to provide back-up assistance and secure the plane. Chief Huth was assigned to the second team, along with Chief Deputy Argo and several deputies from Rhea County and Sequatchie County. Sheriff Hitchcock was assigned to the first team, along with several Sequatchie and Rhea County deputies.

When the plane arrived at the airport, Willis, Jack Marshall, and Robertson got off the plane and went into the airport building while John Marshall remained on the plane. Willis and the others were directed to the lounge area of the airport and were followed by two Sequatchie county deputies. When Willis attempted to use the restroom, one of the deputies, without identifying himself, told her to sit down, and Willis complied. According to Willis, after about thirty minutes, Sheriff Hitchcock entered the room and asked Willis and the others to remove their personal belongings. Fifteen minutes later, a law enforcement officer entered the room pointing a gun and yelled for everyone to get down. Willis and the others were handcuffed and left lying on the ground for several minutes until they were assisted back into chairs; Sheriff Hitchcock assisted Willis. Neither Willis nor her companions asked why they were being held and that information was not offered. Willis and the others were then placed in marked Rhea County Sheriff cars and transported to the Rhea County jail.

Rhea County Sheriff Mike Neal did not arrive at the airport until after Willis and the others had been taken away. Chief Deputy Argo was assigned to the team that was supposed to secure the plane and did not participate in Willis's arrest, but following the arrest of the passengers he called for transport vehicles. Chief Huth's team left the conference room, where they were waiting, in order

to secure the plane. Chief Huth looked into the room where Willis and the others had been handcuffed but did not enter the room.

Upon arriving at the Rhea County jail, officers removed Willis's handcuffs and placed her in ankle shackles. Willis asked to use the restroom, but did not receive a response. Willis was then placed in a visitation room and, sometime later, an officer came into the room and told her that the police wanted to interview her. When Willis again asked to use the restroom, the officer responded that Willis would have to ask the interviewer. Once with the interviewer, Willis again asked to use the restroom, but was told she would have to wait until the interview was over. Willis was informed during the interview that she was being arrested for money laundering. After the interview, Willis was allowed to use the restroom and made to change into a black and white jail suit. Willis asked to use the phone, but was denied. She was held in a jail cell for several hours and the charges against Willis were dismissed on January 13, 2004.

Willis filed suit against Neal, Argo, Hitchcock, Huth, and McMillon, all in their individual and official capacities, and against Rhea County, Sequatchie County, and the City of Dunlap. Willis sued all of the defendants under § 1983, alleging that they violated her Fourth Amendment rights, and also alleged that the defendants committed the state law torts of false arrest, malicious harassment, assault and battery, slander and libel, intentional and negligent infliction of emotional distress, malicious prosecution, abuse of process, and outrageous conduct.

Following discovery, the defendants filed motions for summary judgment. The district court construed Willis's complaint as alleging a *Terry* stop that escalated into an arrest and proceeded to

assess each individual's actions to determine if any of the individuals participated in Willis's arrest. The district court concluded that Sheriff Hitchcock was the only individual defendant that participated in Willis's arrest. Concluding that there was insufficient information to determine that probable cause did or did not exist as a matter of law, the court assumed arguendo that probable cause did not support Willis's arrest, but held that Hitchcock was entitled to qualified immunity because it was not objectively unreasonable for Hitchcock to rely on the instructions of Smith and Sain.

The district court also granted the defendant municipalities' motion for summary judgment. The district court dismissed the City of Dunlap because Chief Huth did not arrest Willis and, therefore, had not established a constitutional violation that could be imputed to the city. The § 1983 claim against Rhea County was dismissed because neither Neal nor Argo participated in or directed Willis's arrest; although Rhea County deputies participated in the arrest, the district court concluded that Willis had not established that the actions of the deputies were pursuant to an official policy set by Sheriff Neal or Chief Deputy Argo. Finally, the § 1983 claim against Sequatchie County was dismissed because, although Sheriff Hitchcock participated in Willis's arrest, the district court concluded that Willis had not presented evidence sufficient to raise a genuine issue of material fact regarding deliberate indifference on the part of Hitchcock. The dismissal of the claims against the municipalities resulted in the dismissal of Willis's claims against the defendants in their official capacities.

Finally, the district court dismissed the state law claims against the defendants. The court

concluded that the defendants' conduct did not rise to the level necessary to deem their actions

outrageous, resulting in the dismissal of Willis's outrageous conduct and intentional infliction of

emotional distress claims.[1] The district court also dismissed the false arrest claims against Sheriff

Neal, Chief Deputy Argo, and Chief Huth because none of them participated in Willis's arrest.

Although summary judgment was initially denied to Sheriff Hitchcock on the false arrest claim, the

district court granted summary judgment on a motion to reconsider, concluding that because Sheriff

Hitchcock was entitled to qualified immunity on Willis's § 1983 claim alleging arrest without

probable cause in violation of the Fourth Amendment, he was also entitled to immunity on Willis's

state law false arrest claim.[2] Willis timely appeals the district court's grant of summary judgment.

## II. Analysis

The court reviews de novo the district court's grant of summary judgment. *Anderson v.

Liberty Lobby*, 477 U.S. 242, 248 (1986). Summary judgment is proper if "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to

---

[1]The district court held that the Tennessee Governmental Tort Liability Act precluded Willis from proceeding with her state law claims against the municipalities and Willis concedes this point in her brief.

[2]Willis does not appeal the district court's dismissal of her claims against the defendants in their official capacities as members of the 12th Judicial District Drug Task Force or the dismissal of her state law claims of malicious harassment, assault and battery, slander and libel, intentional and negligent infliction of emotional distress, malicious prosecution, or abuse of process. Nor does Willis appear to appeal the grant of summary judgment in favor of McMillon.

judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there are genuine issues of material fact, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 248.

**A. § 1983 Claim**

We affirm the judgment of the district court but we affirm on the ground that Willis's arrest was supported by probable cause. Because Willis's arrest was supported by probable cause, her § 1983 necessarily fails. In order to prevail on her § 1983 claim, Willis "must establish that a person acting under color of state law deprived [her] of a right secured by the Constitution or laws of the United States." *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). Willis also bears the burden of establishing that the defendants are not entitled to qualified immunity. *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006).

There does not appear to be a dispute about the fact that Willis was arrested at the airport, at least at the point that officers pointed guns at her, ordered her down on the ground, and handcuffed her. However, Willis has not met her burden of establishing that the arrest was without probable cause. *Fridley v. Hughes*, 291 F.3d 867, 872 (6th Cir. 2002). Willis's primary argument on appeal is that the arresting officers had to know *personally* of the facts supporting a probable cause determination. However, it is well established that the arresting officer need not personally be aware of all of the facts amounting to probable cause and that probable cause can be established by the collective knowledge of the officers on the scene. Many circuits, including our own, have determined that probable cause may be established from the collective knowledge of the police rather

than solely from the officer who made the arrest. *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989). *See also United States v. Killebrew*, 594 F.2d 1103, 1105 (6th Cir. 1979). Thus, the fact that the officers assisting the Task Force may not have had information sufficient to support a probable cause determination does not establish that Willis's arrest was without probable cause.

Willis maintains that "[a]n officer cannot rely upon another officer's probable cause determination when no such determination was in fact made." Presumably, Willis is arguing that Smith and Sain, the officers on whose instructions the defendants were acting, did not have probable cause to arrest her. If Smith and Sain did not have probable cause, then the arrest was in violation of the Fourth Amendment. *Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 568 (1971), for instance, held that although officers were entitled to rely on a bulletin claiming that an arrest warrant had been issued for the defendant, the arrest was in violation of the Fourth Amendment because the warrant itself was not supported by probable cause.

Although the evidence is not overwhelming, the record establishes that Smith and Sain had probable cause to arrest Willis. "The establishment of probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. . . . The judicial determination of probable cause involves evaluating the historical facts leading up to the arrest, and whether those facts, viewed by an 'objectively reasonable police officer,' satisfy the legal standard of probable cause." *United States v. Moncivais*, 401 F.3d 751, 756 (6th Cir. 2005) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)) (internal citation and quotation marks omitted).

McMillon testified in his deposition that Marshall told him that Marshall would be flying to the Dayton airport with his partner to participate in a money laundering scheme and that Marshall indicated that he would be carrying a gun. Marshall said that his father might bring his girlfriend with him and that anyone on the plane knew to keep their mouth shut. When McMillon, acting upon Smith's instructions, attempted to get additional information about who would be on the plane, Marshall again responded that anyone on the plane would know to keep their mouths shut. Willis was on a private plane carrying passengers for the sole purpose of engaging in a money laundering scheme. Given that Marshall had assured McMillon that everyone on the plane knew to keep their mouths shut, including his dad's girlfriend, it was entirely reasonable to conclude that Willis was a participant in the scheme.[3]

Although Willis refers the court to *Ybarra v. Illinois*, 444 U.S. 85 (1979), for the proposition that merely being present at a crime scene is insufficient to support probable cause for an arrest, the facts of *Ybarra* are distinguishable from the facts surrounding Willis's arrest. In *Ybarra*, the Supreme Court held that an individual's presence at a tavern subject to a search warrant was insufficient to support reasonable suspicion to justify a search of that individual. 444 U.S. at 91. However, Willis was not merely a patron in a bar, as was the defendant in *Ybarra*. Although she was merely the co-pilot of a private plane, given the nature of the trip and the fact that John Marshall had

---

[3]Although there is no evidence that Willis was anyone's girlfriend, she was the only woman on the plane and, as long as police had probable cause to arrest the "girlfriend," they also had probable cause to arrest Willis as it was reasonable for the officers to conclude that Willis, the only woman on the plane, was the supposed girlfriend. *Hill v. California*, 401 U.S. 797, 802-03 (1971).

said that a woman might be on the plane, Smith and Sain were reasonable in concluding that Willis was a participant in the money laundering scheme. Indeed, in *Maryland v. Pringle*, 540 U.S. 366, 372-73 (2003), the Supreme Court noted the difference between a passenger in a car and the bar patron in *Ybarra*.[4]

The conclusion that Willis's arrest was supported by probable cause necessarily means that her § 1983 claim against all of the defendants fails because she has not established that her constitutional rights were violated, and the district court properly granted the defendants' summary judgment motions.

Because Willis has failed to establish a deprivation of her constitutional rights, she cannot establish liability against the defendant municipalities. *Bukowski v. City of Akron*, 326 F.3d 702, 712-13 (6th Cir. 2003).

Our judgment in the case should not be read as condoning either the actions of the Task Force or the apparent willingness of the defendant municipalities to participate in Task Force operations based on little information in cases where time is not of the essence. However, Willis has not presented any argument to this court other than one based on the physical participation of the individual officers in her arrest.

**B. State Law Claims**

---

[4]The Supreme Court has repeatedly reasoned that "'a car passenger—unlike the unwitting tavern patron in *Ybarra*—will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing.'" *Pringle*, 540 U.S. at 373 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 304-05 (1999)). The same is obviously true of a small plane with four occupants.

Although Willis maintains that the district court failed to address her claim of outrageous conduct, the district court thoroughly analyzed her claim of intentional infliction of emotional distress, which is the same cause of action as one for outrageous conduct. *Bain v. Wells*, 936 S.W.2d 618, 622 n.3 (Tenn. 1997). The district court's analysis of the claim was appropriate given that

> "'[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to
be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'"

*Id.* at 623 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Even if Willis was arrested without probable cause, nothing so outrageous occurred during the arrest that would support her claim of outrageous conduct. Although she pointed out in her filings in the district court that the repeated refusals of her requests to go to the bathroom would support her claim for outrageous conduct, she hasn't alleged that any of the individual defendants refused her request to go to the bathroom. Sheriff Hitchcock was the only defendant that Willis interacted with and she stated that she never asked him to go to the bathroom. Thus, the district court properly dismissed this claim.

The district court also properly dismissed Willis's false arrest claims. First, the arrests were supported by probable cause.[5] However, if there was no probable cause for the arrest, the district court was correct in looking to Tennessee law to determine whether qualified immunity also applies

---

[5]In other contexts, Tennessee state courts have concluded that officers may rely on the information provided to them by fellow officers. *See, e.g.*, *State v. Ash*, 12 S.W.3d 800, 805 (Tenn. Crim. App. 1999) (requirement of being present for misdemeanor arrest); *State v. Hopson*, 1997 WL 379142, at *3 (Tenn. Crim. App. July 8, 1997) (investigative stop) (citing *State v. Seaton*, 914 S.W.2d 129, 131 (Tenn. Crim. App. 1995) (investigative stop)).

to the false arrest claim. The district court concluded that the Tennessee Court of Appeals' decision in *Youngblood v. Clepper*, 856 S.W.2d 405, 407-08 (Tenn. Ct. App. 1993), precluded Willis's false arrest claim. This court has previously held, as did the district court, that Tennessee law provides qualified or good faith immunity of government employees for state law torts. *Rogers v. Gooding*, 84 Fed. Appx. 473, 477 (6th Cir. 2003) (concluding, in reliance on *Youngblood*, that the plaintiff's claim for assault and battery was precluded by qualified immunity). We find no error in the district court's dismissal of Willis's state law claims.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

No. 06-5695
*Willis v. Neal, et al.*

**DAVID D. DOWD, JR., Senior District Judge, dissenting.**

I cannot join the majority's opinion because I am not convinced that the record supports a

conclusion, on summary judgment, that there was probable cause for the arrest of Willis. Even

though I might be able to agree that there is probably no individual liability on the part of the various

officers, where I part company is with the majority's conclusion regarding the possibility of liability

under *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). To that extent, I

respectfully dissent. I would remand on this issue and allow a jury of Willis's peers to decide

whether there is any *Monell* liability for the arrest of Willis.

If the focus is solely on what happened in the Dayton, Tennessee airport on October 7, 2003,

the district court's conclusions are probably correct; that is, there may be no individual liability on

the part of the individually named officers and deputies. That does not, however, automatically

mean that there can be no municipal liability.

As aptly explained in *Epps v. Lauderdale County, Tennessee*, 2002 WL 1869434, at *2-3 (6th

Cir. Aug. 13, 2002) (Cole, J., concurring):

> . . . I write separately . . . to clarify my understanding of *City of Los Angeles v. Heller*,
> 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam), that a
> municipality may still be held liable for a substantive due process violation even
> when the individual officer is absolved of liability.
>
> When no constitutional harm has been inflicted upon a victim, damages may
> not be awarded against a municipality. *Heller*, 475 U.S. at 799, 106 S.Ct. 1571. But
> a finding that the individual government actor has not committed a constitutional
> violation does not require a finding that no constitutional harm has been inflicted
> upon the victim, nor that the municipality is not responsible for that constitutional
> harm. *See City of Canton v. Harris*, 489 U.S. 378, 388-89 n. 8, 109 S.Ct. 1197, 103
> L.Ed.2d 412 (1989) (noting that the deliberate indifference standard for municipal

- 14 -

liability is independent from the state of mind standard used to establish the liability of an individual government actor); *see also Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 121-22, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (highlighting the "separate character of the inquiry into the question of municipal responsibility and the question whether a constitutional violation occurred." ). I read *Heller* to prohibit municipal liability only when the victim suffers no constitutional injury at all, not when the victim fails to trace that constitutional injury to an individual police officer. *Cf., e.g., Claybrook v. Birchwell*, 199 F.3d 350, 361 (6th Cir. 2000) (citing the language of *Heller* to deny a victim's substantive due process claim, but not addressing the case where the victim actually did suffer a constitutional injury).

A given constitutional violation may be attributable to a municipality's acts alone and not to those of its employees--as when a government actor in good faith follows a faulty municipal policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Dodd v. City of Norwich*, 827 F.2d 1, 9 (2d Cir. 1987) (Pratt, J., dissenting) (noting that the city's policy could be unreasonable, "even if [the individual government actor] himself, who was trained to follow that policy, was found to be not negligent in his own conduct."). A municipality also may be liable even when the individual government actor is exonerated, including where municipal liability is based on the actions of individual government actors other than those who are named as parties. *See Proprotnik v. City of St. Louis*, 798 F.2d 1168 (8th Cir. 1986), *rev'd on other grounds*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *de Feliciano v. de Jesus*, 873 F.2d 447 (1st Cir. 1989); *Carapellucci v. Town of Winchester*, 707 F.Supp. 611 (D.Mass. 1989). Moreover, it is possible that no one individual government actor may violate a victim's constitutional rights, but that the "combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights." *Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir. 1985).

My concern is focused on what may be the separate official policies of the City of Dunlap, Sequatchie County, and Rhea County, to permit their law enforcement personnel to participate in "takedowns" by the Task Force without any attempt to ascertain for themselves whether there is a factual basis to believe there is probable cause for an arrest.

No. 06-5695
*Willis v. Neal, et al.*

The majority affirms the judgment of the district court with respect to the § 1983 claim on the ground that Willis's arrest was supported by probable cause.[6] To reach this conclusion, the majority cites *Collins v. Nagle*, 892 F.2d 489, 496 (6th Cir. 1989) for the proposition that probable cause may be established from the collective knowledge of the police. I do not disagree with this legal proposition; however, the record does not support the existence of the requisite collective knowledge.

The majority declares that "John Marshall told McMillon that Robertson and his father, Jack Marshall, would accompany him [on the plane] and that his father's girlfriend might also be on the plane[, ]" that "everyone on the plane knew to keep their mouths shut[,]" and that John Marshall "indicated that he would be armed." (Maj.Op. at 2-3). This information was *supposedly* given to

---

[6]The district court actually improperly characterized this takedown as a *Terry* stop which does not require probable cause. As very recently noted by another panel of this circuit:

> . . . An officer may permissibly conduct an investigatory stop when he or she can point to "a particularized and objective basis" that "leads . . . reasonably to [the conclusion] in light of [the officer's] experience that criminal activity may be afoot and that the persons with whom [the officer] is dealing may be armed and presently dangerous." *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir.1999). Reasonable suspicion for an investigative stop must be considered under the totality of the circumstances, considering "all of the information available to law enforcement officials at the time." *Feathers*, 319 F.3d at 849.

*Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007). This was *not* an investigatory stop based on an officer's hunch about something he or she had observed in the course of the officer's duties or on some sort of information from a dispatcher that required a quick response. This was a *planned* takedown and, for that reason, there is little or no justification for allowing any benefit of a doubt.

- 16 -

the Task Force officers by Smith or Sain during the briefing conducted on the morning of October

7, 2003 and forms the "collective knowledge" supporting "probable cause" for the arrest of Willis.

The flaw not acknowledged by the majority is that the record contains *no* testimony or

affidavit from Smith or Sain regarding what McMillon may or may not have told them and/or what

they, in turn, told the Task Force, and there are only brief excerpts from the deposition of McMillon

himself.[7]  Both the district court and the majority improperly drew all inferences in favor of the

defendants apparently based on vague testimony from the various defendants (but not from Smith

or Sain) about what *impressions* the defendants had regarding the underlying facts of the takedown.[8]

---

[7]I have not relied solely on the Joint Appendix which, as is typical, is quite inadequate.  I went directly to the electronic docket of the district court believing I would find more sworn testimony by way of depositions and the like.  I was sorely disappointed, finding only the same inadequate excerpts of depositions.  It is one thing for the Joint Appendix not to contain the evidence; it is another thing entirely for the district court record not to contain it.

[8]The various defendants' sworn testimony is too vague to rely on, without a jury finding.  For example, defendant Huth's affidavit simply acknowledges that he and the others were "brief[ed] regarding the money laundering operation." (JA 49 ¶ 9).  In Huth's deposition, he indicates that Smith called him a few days before October 7, 2003 to enlist his help, but that Smith did not even indicate how many people would be on the plane (JA 51), other than that "there would be multiple people on the plane." (JA 53).  Huth's deposition recollection of the briefing was "that there was going to be an airplane coming in there in Dayton, and that it was involving this money laundering operation he [Smith] had been working." (JA 52-53).  Huth states: "And basically, that was pretty much about it." (JA 53).  Huth knew nothing about the particulars of the investigation. (JA 110).
  Defendant Neal testified at his deposition that, after a call from Smith asking for help, Neal contacted his chief deputy, defendant Argo.  Neal told Argo that he "didn't know what the operation [at the airport] was[.]"  (JA 159).  He further testified that the only thing he knew was "that it involved jewelry and they said money laundering[.]" (JA 160).  In fact, Neal did not believe he and his officers did anything more than "help do the security[ ]" for the operation. (*Id.*).
  Defendant Argo testified at his deposition that "Rick Smith advised that they had an ongoing investigation involving some jewelry and money laundering, that some people were flying up from Florida, that they would be flying into the Dayton Airport, and that they needed some assistance on securing the plane and the personnel on the plane." (JA 165).  Argo was not even told whether the

- 17 -

Both the district court and the majority seem to rely on deposition testimony of McMillon as to what he learned from John Marshall; but -- and this is very important -- there is nothing in McMillon's deposition testimony or in the record as a whole that makes clear that he actually passed any of this particular information on to Smith or Sain. Since there is no testimony from Smith or Sain, we really do not know for sure what Smith or Sain knew much less what they communicated to the Task Force members. Without knowing what Smith or Sain knew, we cannot declare on summary judgment (where all inferences must be drawn in favor of the non-movant) that *they* had probable cause to arrest Willis and that, therefore, the other officers were permitted to rely on Smith's and Sain's probable cause determination. These are facts for a jury to find, not for a court to conclude by drawing unsupported inferences from a vague record.

In my view, because Huth and Hitchcock (acting in their official capacities as agents and policy-makers for the City of Dunlap and Sequatchie County, respectively), and Argo (acting in his official capacity as agent of Neal, who is the policy-maker for Rhea County) were *all* involved in decision-making capacities during the relevant pre-takedown time frame, if the facts support a conclusion that they all proceeded to the Dayton, Tennessee airport without even a minimal attempt

---

people would be male or female. (*Id*.). He thought he had been told that "one or more could be armed[.]" (*Id*.). Argo only knew that he was to wait for a signal from Smith "to take them down." (JA 166).

Defendant Hitchcock testified that Smith "just told that they was supposed to be a plane coming in with some jewels on it, something about some money laundering, and that's about it." (JA 181). Hitchcock also thought that Smith had "ma[d]e a statement that one subject might be armed." (*Id*.).

All the defendants seem to agree that the officers who showed up to help on October 7, 2003 were divided into two teams, one to secure the airplane and one to secure the people coming off the plane.

to ascertain for themselves whether there was a sufficient basis to support a probable cause determination that would justify their independent participation in what appears to have been a warrantless takedown, they were *all*, to that extent, "involved in" Willis's arrest.

Since this was *not* a *Terry* stop that escalated into an arrest but, rather, simply an outright arrest, if it was without probable cause and if it resulted from "a faulty municipal policy," *Epps*, *supra*, at *3, then one or more of the governmental entities may be liable. The district court dismissed the City of Dunlap, Sequatchie County and Rhea County, concluding that, since none of the individual officers had violated Willis's constitutional rights, there was no basis for finding municipal liability. At the very least, there are material factual disputes which must be sorted out by a jury before anyone can reach the conclusion that there is *no* basis for municipal liability. If it eventually proves true that the policy of these governmental entities was simply to rely blindly on assertions by Task Force Officers Smith and Sain as to probable cause determinations, in a situation where urgency is not a factor, then the governmental entities can be held liable.[9] *See Pembaur v.*

---

[9]Even the Interlocal Cooperation and Mutual Aid Agreement, under which the Twelfth Judicial District Drug Task Force had enlisted the aid of the officers of these various governmental entities for this takedown, recognizes that officers do not relinquish any responsibility simply by participating in the Task Force activities. The Agreement provides, in part, as follows:

> 12. LIABILITIES. <u>Officers Assigned to the Drug Task Force Remain Employees of Their Hiring Agency</u>. Each law enforcement officer assigned to the Drug Task Force will remain an employee of the local government by which the officer was employed prior to the assignment. The conduct and actions of such officer will remain the responsibility of the local government employing the officer. Any civil liability arising from the actions of a law enforcement officer engaged in Drug Task Force activities will be assumed by the employing local government in the same manner and to the same extent as if the actions were committed within the jurisdiction of the employing local government during the normal course of the

No. 06-5695
*Willis v. Neal, et al.*

*City of Cincinnati*, 475 U.S. 469, 480 (1986) ("it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances") (citing *Monell*, 436 U.S. at 694, for the proposition that the acts and decisions of certain officials can be found to represent official policy).

In my view, the problem here is not so much what happened at the airport but what happened at a *policy level* before October 7, 2003. As explained above, it is the apparent policy of these governmental entities to permit their officers and deputies to rather blindly participate in activities initiated by the Task Force without any independent assurance that there is a factual basis for those activities. In this case, that apparent policy resulted in an arrest without probable cause for which the various governmental entities may be liable.

I would affirm the district court as to all but its ruling regarding municipal liability and remand for further proceedings with respect to this issue alone as it relates to defendants Rhea County, Sequatchie County, and City of Dunlap.

officer's employment, independent of the Drug Task Force. . . .