NOT RECOMMENDED FOR PUBLICATION
File Name:  17a0270n.06

No. 16-3089

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
May 10, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| CACHET BECKHAM and MARCUS A. LEWIS, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| CITY OF EUCLID; STEVEN BUY; SHERRI | ) | COURT FOR THE NORTHERN |
| TRAVIS; ROBERT NOLAN; RENEE MCINTYRE; | ) | DISTRICT OF OHIO |
| and VIC STEPEC, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE:  GRIFFIN, WHITE, and DONALD, Circuit Judges.

GRIFFIN, Circuit Judge.

This appeal is one of the rare instances in which the parties agree defendants are at fault. Plaintiffs Cachet Beckham and Marcus Lewis spent their Easter weekend in jail after the Euclid Municipal Court mistakenly found they failed to report for court-ordered community service. Plaintiffs had in fact reported as ordered. Officers Steven Buy, Sherri Travis, Renee McIntyre, and Vic Stepec and Bailiff Robert Nolan each had a hand in their arrest and detention. Seeking to hold the officers and the City of Euclid liable, Beckham and Lewis filed this 42 U.S.C. § 1983 action alleging violations of their Fourth and Fourteenth Amendment rights.

The district court ultimately granted defendants summary judgment on all counts. The erroneous arrests notwithstanding, plaintiffs have not demonstrated a violation of their constitutional rights. We therefore affirm the district court's judgment.

I.

On February 25, 2013, plaintiffs appeared in the Euclid Municipal Court and pleaded no contest to charges for possession of drug paraphernalia and cultivation of marijuana. Judge Deborah LeBarron accepted their pleas and sentenced plaintiffs to fines and court costs. Plaintiffs moved for permission to perform community service in lieu of the costs and fees, and the court granted their motions. On March 1, 2013, Judge LeBarron entered orders directing Beckham and Lewis to "CONTACT THE PROBATION DEPT., IN PERSON, WITHIN 10 DAYS" to schedule their community service.

Ordinarily, when the court grants a motion to perform community service in lieu of a fine, a court employee puts the order in the Probation Department's mailbox located in the Clerk's office. An on-duty probation officer checks the mailbox throughout the day and brings the mail to the Probation Department office, just down the hall. Whoever collects the mail sorts it among the mailboxes of Probation Department employees. The on-duty officer will place court orders for community service in the mailbox of Officer Steven Buy, who oversees the community work service program. Buy, in turn, places the community service orders in a separate manila folder, in a different slot of the mailbox. Although the slot is not labeled, "[e]verybody knows it's for community work service."

An order for community service typically directs the defendant to report to the Probation Department within ten days of issuance. When the defendant reports, he signs in at the Department's front desk, writing "CWS" next to his name for "community work service." The officer manning the desk assists the defendant and retrieves his court order from the manila folder. He gives the defendant an "Option Form" and explains that the defendant can sign up for community service through Euclid Municipal Court or Court Community Service ("CCS"), an

independent third party. If the defendant chooses CCS, the officer completes a CCS Client Data sheet. The officer faxes the Client Data sheet, Option Form, and court order to CCS. When the fax is complete, the officer staples all three documents together and places them back into Officer Buy's mailbox. Officer Buy removes this packet and files it alphabetically in a three-ring binder. He also records the defendant's information in a spreadsheet where he keeps track of community service hours completed and other relevant information.

Buy periodically checks the manila folder for leftover orders—*i.e.*, orders that officers have not retrieved to sign the defendant up for community service. If an order is still in the folder after the 10-day sign-up window, this indicates the defendant has failed to timely report, thereby violating the order. Officer Buy compiles a list of the non-reporting defendants and submits it in a memorandum to Judge LeBarron to request warrants for their arrest.

Plaintiffs reported to the Probation Department on March 7, 2013, within the 10-day window set by Judge LeBarron's March 1st orders. Officer Sherri Travis retrieved their community service orders and assisted them. Beckham and Lewis chose the CCS option, which permitted them to perform service without interfering with their work schedules. Officer Travis told plaintiffs to contact CCS to schedule their service. She took their court orders, Option Forms, and CCS Data sheets and faxed them to CCS. Travis testified that she then placed these documents in Officer Buy's mailbox, per the usual procedure. Plaintiffs did as instructed, and CCS assigned them to work at a local Goodwill three days a week.

On March 14, three days after the 10-day deadline and seven days after plaintiffs reported to the Probation Department, Officer Buy checked the manila folder. Inside he found Judge LeBarron's orders directing Beckham and Lewis to report and schedule their community service. Buy also checked his spreadsheet and his three-ring binder, but did not find plaintiffs'

community service information. He admittedly did not check the sign-in sheet Beckham and Lewis signed days earlier. Believing plaintiffs failed to report within the 10-day deadline, Officer Buy included their names in a memorandum to Judge LeBarron requesting warrants for their arrest "for failure of community service."

Travis later surmised that Judge LeBarron's March 1st orders must not have reached the Probation Department's mailbox until after March 7, once plaintiffs already signed up. Neither officer explains why, if Travis had placed their community service information in his mailbox as she testified, Buy did not receive the information. However, both attest "there have been no prior instances of warrants being mistakenly requested as a result of errors by the Euclid Municipal Court Probation Department."

Upon receipt of Officer Buy's memorandum, Judge LeBarron issued bench warrants for plaintiffs' arrest. On March 28, 2013, as Beckham and Lewis were leaving their third day of community service and driving to pick up their children from daycare, a Wickliffe police officer arrested them. He explained they had active warrants for "failure of community service."

Dispatch informed Bailiff Robert Nolan, a Euclid Municipal Court Deputy, of plaintiffs' arrest. Nolan pulled plaintiffs' warrants from the record room and confirmed that, as far as he knew, they were in effect. He then drove to the border between Euclid and Wickliffe, where the Wickliffe officer had plaintiffs in custody. Nolan placed Beckham and Lewis under arrest for failure of community service, informing them of the charge a second time. He handcuffed plaintiffs (putting Beckham in a "belly belt cuff" when she disclosed that she was pregnant), placed them in the back of his vehicle, and drove to the Euclid Jail.

Beckham and Lewis explained that there must be a "mixup"; they were just leaving community service, and they had paperwork from CCS—specifically, Beckham had paperwork

showing she signed up for community service, where she was assigned to work, and her start date, and Lewis had a receipt showing he had paid CCS the required $65 referral fee. Nolan declined to look at their paperwork. "[T]hat very well may be," he said, "but . . . I still have the warrant[s] for failure of community service." Beckham testified that Nolan told plaintiffs he "hear[d] this story every day," and that they "would be able to explain [it] to someone once [they] got to jail."

Officers Renee McIntyre and Vic Stepec booked plaintiffs at the Euclid Jail, providing each with a copy of his or her respective warrant. Speaking to McIntyre, Beckham "explained everything again": that she was pregnant, was performing community service, had paperwork from CCS, and had to pick her children up from daycare before 6:00 p.m. Lewis did the same. McIntyre and Stepec declined to look at plaintiffs' paperwork. Around 8:00 p.m., after about three hours in separate holding cells, the officers permitted plaintiffs to use the phone and make arrangements for their children. Neither plaintiff posted bond. Because Euclid Jail does not house women, the Jail transferred Beckham to Lake County Jail.

On April 1, 2013, after a four-day Easter weekend, Lewis appeared in court before Judge LeBarron. He explained that he had in fact begun community service as required and the Probation Department made a mistake. Judge LeBarron asked Officer Buy to check his records "to see what happened." When he did, Buy found plaintiffs' information in his community service binder and in his spreadsheet. Buy had "no idea" why their names were not in either record at the time he requested the warrants. Judge LeBarron apologized to Lewis, suspended his remaining fines and court costs, cancelled his remaining community service obligation, and ordered his release from custody.

After being transferred back from the Lake County Jail, Beckham appeared before the court on April 2, where, after a similar exchange, Judge LeBarron likewise ordered her release, suspended her remaining fines and court costs, and cancelled her remaining community service obligation. Both plaintiffs describe their stay in jail as traumatizing, but Beckham suffered the most tangible consequences: her employer terminated her employment for failure to report to work; she experienced pregnancy-related nausea; her "car had been towed, and [her] children [had been] left with [her] elderly grandmother."

## II.

Roughly a year after their arrest, plaintiffs filed the present action against Officers Buy, Travis, McIntyre, Stepec, Bailiff Nolan, and the City of Euclid. Relying primarily on 42 U.S.C. § 1983, their amended complaint alleged Fourth and Fourteenth Amendment claims against all individual defendants in their official, and individual, capacities, as well as *Monell* actions against the City for: (1) tolerating and permitting the faulty manila-folder system, notwithstanding the "obvious" risk of unlawful arrest; and (2) failing to train its officers "as to the correct procedure and circumstances in which an officer may arrest or detain an individual." Plaintiffs also alleged a state-law negligent identification claim against Buy and Travis individually, claiming they failed to conduct a reasonable investigation into whether plaintiffs violated their court orders, despite their obligation to do so.

After discovery, the district court granted defendants' motions for summary judgment. The court dismissed the individual-capacity claims against the officers primarily on qualified immunity grounds, and the *Monell* claims against the City in part because Beckham and Lewis failed to demonstrate an underlying violation of their constitutional rights. It rejected plaintiffs'

state law negligent-identification claim against Travis and Buy because "employees of political subdivisions are immune from claims of negligence" under Ohio law. Plaintiffs appeal.

III.

We review the district court's grant of summary judgment and qualified immunity de novo. *Keith v. Cty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013); *Rodriguez v. Passinault*, 637 F.3d 675, 680, 689 (6th Cir. 2011). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact" and "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence permits a reasonable jury to return a verdict in favor of the nonmovant, and a fact "material" if it may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Viewing the evidence in a light most favorable to the nonmoving party, our task is to determine "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

A.

Beckham and Lewis contend individual defendants Buy, Travis, Nolan, Stepec, and McIntyre arrested and detained them in violation of their Fourth Amendment rights. Defendants counter that qualified immunity precludes recovery on plaintiffs' individual-capacity claims.[1]

---

[1]The analysis that follows applies to the remaining officers, but plaintiffs' allegations against Travis fail for a simpler reason. In their individual-capacity claim (Count I), plaintiffs contend Travis "issued and published warrants" resulting in plaintiffs' improper arrests. This is inaccurate. Officer Travis played no role in "issu[ing] and publish[ing]" the bench warrants. She made a mistake sometime earlier when she signed Beckham and Lewis up for community service. *See Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) ("Each defendant's liability must be assessed individually based on his own actions."). Insofar as Count I can be read to assert an individual-capacity claim against Travis for the filing error, it fails as a matter of law. Misfiling a court document may be "tantamount to negligence, but negligence does not equate to a constitutional violation." *Snyder v. United States*, 590 F. App'x 505, 514 (6th Cir. 2014) (internal quotation marks omitted); *see also Davidson v. Cannon*, 474 U.S. 344, 347–48 (1986)

Qualified immunity shields government officials from civil liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Bletz* v. *Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (citation omitted). To determine whether qualified immunity applies, "the court makes two inquiries." *Id.* Viewing the facts in a light most favorable to the injured party, we ask (1) whether the officer's conduct violated a constitutional right, and (2) whether that right was "clearly established" at the time of the violation. *Id.* If the plaintiff's claim fails one prong, the court need not address the other. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Success on a Fourth Amendment false-arrest claim requires the plaintiff to prove the defendant officer arrested him despite lack of probable cause to believe the plaintiff committed a crime. *Robertson v. Lucas*, 753 F.3d 606, 618 (6th Cir. 2014). Because "an arrest warrant is valid only if supported by probable cause," *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999), an arrest "pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest or imprisonment." *Robertson*, 753 F.3d at 618 (quoting *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)). Focusing on Ohio law, the parties here dispute whether the same probable-cause requirement applies to bench warrants issued under Ohio Revised Code § 2705.02(A)—the contempt statute Judge LeBarron relied upon in ordering Beckham's and Lewis's arrest based on her belief that they failed to report as required.[2] The parties forget this is a § 1983 action.

---

("[A] lack of care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent.").

[2]This statute authorizes Ohio courts to hold an individual in contempt for "[d]isobedience of, or resistance to," a court order. Ohio Rev. Code § 2705.02(A). Plaintiffs complain that the contempt warrants in this case are somehow invalid because they "were signed and issued by Deputy Clerk Sue Kalpec and do not contain the name of a judge or magistrate." This is not a

Section 1983 provides a means of vindicating federal rights; "[i]t does not cover official conduct that allegedly violates state law." *Michael v. Ghee*, 498 F.3d 372, 375 (6th Cir. 2007) (citation omitted). A plaintiff may therefore challenge a state procedure in a § 1983 action "only to the extent that the challenge invokes federal statutory or constitutional rights." *Id.* at 375–76. That is what plaintiffs do here. Apart from their negligent-identification claim, Beckham and Lewis do not allege a violation of their state-law rights. They allege the City of Euclid maintains a policy of issuing bench warrants without probable cause in violation of their Fourth and Fourteenth Amendment rights. Whether this policy also violates Ohio law is beside the point.

The Fourth Amendment's prohibition against unreasonable arrests "sets a national floor" of minimum protection. *Graves v. Mahoning Cty.*, 821 F.3d 772, 778 (6th Cir. 2016). Ohio's legislature "may . . . establish protections [above] that floor," but it may not delve beneath it. *Id.* "[S]tate restrictions do not," and cannot, "alter the Fourth Amendment's protections." *Virginia v. Moore*, 553 U.S. 164, 176 (2008). Thus, the operative question for our purposes is whether, under the Fourth Amendment, a magistrate must find probable cause to believe that a defendant violated a court order before issuing a bench warrant, just as he must find probable cause to believe that a defendant committed a crime before issuing a criminal arrest warrant. Assuming such a showing is required, the information Officer Buy relied upon meets this standard—despite his failure to include sufficient facts in the list he submitted to Judge LeBarron.

## B.

To satisfy the Fourth Amendment's Warrant Clause, "a neutral and detached magistrate must independently determine that probable cause exists after weighing the evidence supplied by the police." *Graves*, 821 F.3d at 774 (citations omitted). He "must judge for himself the

---

defect. Clerks may legally issue arrest warrants. *Shadwick v. City of Tampa*, 407 U.S. 345, 350–52 (1972).

persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime." *United States v. Evans*, 574 F.2d 352, 354 (6th Cir. 1978) (quoting *Giordenello v. United States*, 357 U.S. 480, 486 (1958)). If the officer's statement "consists of nothing more than the complainant's conclusion that the individuals named . . . perpetrated the offense described," without any "operative fact[s]" demonstrating the basis for that conclusion, the statement is insufficient. *Whiteley v. Warden*, 401 U.S. 560, 565 (1971); *see also Graves*, 821 F.3d at 775 (complaints stating "only that 'the defendant did the elements of the crime' 'in violation of' some state law" do not supply enough information for a probable-cause determination) (brackets omitted).

Here, we have even less than a conclusory statement that "the [plaintiffs] did the elements of the crime in violation of some state law." *Graves*, 821 F.3d at 775 (internal quotation marks and brackets omitted). After Officer Buy reviewed the orders left in the manila folder, he compiled a list of names and case numbers in a memo to Judge LeBarron under the heading, "Warrants requested for Failure of Community Service." The list identifies Beckham's and Lewis's status as "Not-Completed." Buy initialed the memo, but it is not a sworn statement. It includes no explanation of the basis of his knowledge, or an indication that he investigated or reviewed his records to determine who failed to report. Buy did not testify before, or speak to, Judge LeBarron regarding these omitted facts; he left the list on a shelf outside her office.

"But that does not mean the plaintiffs prevail." *Id.* "The Fourth Amendment prohibits 'unreasonable searches and seizures' not warrantless ones." *Id.* And a violation of the Warrant Clause does not necessarily establish a violation of the Reasonableness Clause. *Id.* Rather, an officer's decision to seize a suspect is reasonable so long as the officer has probable cause—

"even if the arrest warrant is invalid." *United States v. Fachini*, 466 F.2d 53, 57 (6th Cir. 1972); *see also Graves*, 821 F.3d at 776. "The question [thus] becomes . . . whether," notwithstanding the absence of a valid warrant, "the arresting officers were justified in their belief that [the] plaintiff had probably committed or was committing a crime." *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) (footnoted omitted).

In this case, the facts not revealed in Buy's list—that he found plaintiffs' court orders in the manila folder, and that their information was not listed in his binder, or in his spreadsheet—are sufficient to demonstrate probable cause to believe Beckham and Lewis failed to report as required. *See Evans*, 574 F.2d at 354–55 (noting that, if the warrant in that case had been issued for the defendant's failure to appear, instead of his underlying traffic tickets, the clerk's sworn list of names with an explanation that each named individual failed to appear may suffice to provide probable cause). That Buy's belief was ultimately incorrect is of no constitutional moment. *See Criss*, 867 F.2d at 262 ("A valid arrest based on then-existing probable cause is not vitiated if the suspect is later found innocent.").

"To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) (internal quotation marks and citation omitted). "[S]earches and seizures based on mistakes of fact can be reasonable." *Id.* If, for example, "officers with probable cause to arrest a suspect mistakenly arrest an individual matching the suspect's description, neither the seizure nor the accompanying search of the arrestee would be unlawful." *Id.* (citing *Hill v. California*, 401 U.S. 797, 802–05 (1971)). "The limit is that 'the mistakes must be those of reasonable men.'" *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

Officer Buy's mistake in this case was reasonable. He reviewed his records in keeping with a system that, up to this point, had not resulted in any erroneous arrests. Judge LeBarron's orders remained in the manila folder past the 10-day window, and Buy's binder and spreadsheet turned up no information for Beckham and Lewis. He therefore had reason to believe plaintiffs failed to report as required—and this reasonable mistake of fact still justifies a finding of probable cause. *Id.* at 537.

While it is true that Buy failed to check the sign-in sheet, we assess probable cause from the perspective of a reasonable officer at the time he acted, not with the benefit of hindsight. *Gardenhire v. Schubert*, 205 F.3d 303, 311, 318 (6th Cir. 2000). "The Fourth Amendment, after all, necessitates an inquiry into probabilities, not certainty." *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998). Once Buy had sufficient facts to warrant a reasonable belief that Beckham and Lewis failed to appear, he was in a position to request a warrant; he was not obligated to investigate further. *Gardenhire*, 205 F.3d at 316.

Although Judge LeBarron issued the bench warrants without information sufficient to make an independent determination of probable cause, Officer Buy had probable cause to believe plaintiffs failed to report for community service. Plaintiffs therefore fail at the first prong of the qualified immunity inquiry; they have not established a violation of their constitutional rights, much less a "knowing[] or intentional[]" one. *Ahlers*, 188 F.3d at 373.

Still Beckham and Lewis protest. They argue that because the bench warrants were not *themselves* based on a proper showing of probable cause, the warrants were not "facially valid" and do not afford the defendants who relied on them (Nolan, Stepec, and McIntyre) a "complete defense" to liability. *Robertson*, 753 F.3d at 618 (citation omitted). Plaintiffs misunderstand. The bench warrants do not shield defendants from liability; the existence of probable cause does.

"If this standard is met," officers may undertake an arrest "even if the arrest warrant is invalid." *Fachini*, 466 F.2d at 57. Beckham and Lewis correctly argue that an officer's conclusory affidavit—or list of names—can render an arrest warrant defective. *Graves*, 821 F.3d at 775. But the resulting seizure violates the Fourth Amendment only if the officer *also* "lacked 'probable cause for arrest without a warrant.'" *Id.* at 776 (quoting *Whiteley*, 401 U.S. at 566). That is not the case here.

"No one is liable for a constitutional violation that never occurred. That includes local governments." *Gohl v. Livonia Public Schs. Sch. Dist.*, 836 F.3d 672, 685 (6th Cir. 2016). Our conclusion that Buy had probable cause to arrest plaintiffs therefore "necessarily means" their Fourth Amendment claims fail against all other defendants, including the City of Euclid. *Willis v. Neal*, 247 F. App'x 738, 744 (6th Cir. 2007); *see also Gohl*, 836 F.3d at 684–85 (dismissing equal protection claims against all defendants). Accordingly, the district court did not err in granting defendants summary judgment on plaintiffs' Fourth Amendment claims.

## C.

That leaves only plaintiffs' state law negligent-identification claim against Travis and Buy. During the pendency of this appeal, the Ohio Supreme Court clarified that "Ohio does not recognize the tort of negligent misidentification." *Foley v. Univ. of Dayton*, Slip. Op. 2016-Ohio-7591, ¶ 17 (Nov. 3, 2016 Ohio). This is reason enough to affirm the district court's grant of summary judgment in favor of defendants.

## IV.

The circumstances of this case are, in the district court's words, "unfortunate and regrettable." But not every error in governmental judgment, even one that causes significant

inconvenience, amounts to a violation of constitutional rights.  Finding no such violation here, we affirm the judgment of the district court.

**HELENE N. WHITE, Circuit Judge, concurring.**

I concur in the judgment. I write to address a few additional points.

It is unclear what happened with the paperwork. Buy's supposition—that the judge's March 1st orders must not have reached the Probation Department's mailbox until after plaintiffs signed up for community service on March 7—does not account for the fact that Travis faxed the orders to CCS on March 7. And, if Travis placed the orders and referral information in Buy's mailbox after faxing the information, there is no explanation for Buy's claim that they were not present when he first looked. Under these circumstances, plaintiffs have not shown which officer is to blame, and in any event, have shown no more than negligence.[1]

As to the other officers, "we assess probable cause from the perspective of a reasonable officer at the time he acted." (Maj. Op. at 12 (citing *Gardenhire v. Schubert*, 205 F.3d 303, 311, 318 (6th Cir. 2000)).) Buy's memorandum was not attached to the arrest warrants, so the other defendants could not have relied on it. Rather, they relied on the warrants, and "[p]olice officers are entitled to rely on a judicially secured warrant for immunity from a § 1983 action . . . unless the warrant is so lacking in indicia of probable cause, that official belief in the existence of probable cause is unreasonable." *Yancey v. Carroll Cty., Ky.*, 876 F.2d 1238, 1243 (6th Cir. 1989) (citing *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986)); *Robertson v. Lucas*, 753 F.3d 606, 618 (6th Cir. 2014). Plaintiffs acknowledge that bench warrants do not require separate indicia of probable cause. Even if, as Plaintiffs assert, Judge LeBarron did not properly journalize her intent to issue the bench warrants under Ohio law, that alleged error was not apparent from the faces of the warrants, so for purposes of § 1983 liability, Nolan, McIntyre, and Stepec were entitled to rely on them.

---

[1] Footnote 1 of the majority opinion further explains why Travis cannot be held liable.

Still, what happened to Cachet Beckham and Marcus Lewis was not only "unfortunate and regrettable," (Maj. Op. at 14 (quoting R. 75, PID 2450)), but also preventable and reflective of a disturbing cynicism and callousness. No doubt police officers and jail officials hear many protestations of innocence and claims of mistake. But the assumption that the couple were just advancing a "story" that the officers had heard many times before would have been belied by a glance at the paperwork they offered several times. And, although the officers were not obliged to investigate further from a constitutional standpoint, they knew that the Euclid Municipal Court was about to close for the long weekend and common decency should have led at least one of them to look at the documents and make a few inquiries.

Additionally, we were informed at oral argument by attorneys for both sets of appellants that no changes have been made in the Euclid Municipal Court's system for tracking community-service compliance. At some point, requesting warrants based on a knowingly flawed system may crossover from negligence to recklessness.