RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0148p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

KATHRYN A. BLETZ, Personal Representative
of the ESTATE OF FRED ROGER BLETZ,
Deceased, and KATHRYN A. BLETZ,
individually,

          *Plaintiff-Appellee*,

     *v.*

TRAVIS GRIBBLE and BRENT DENNY,
individually, jointly and severally,
          *Defendants-Appellants*.

No. 09-2006

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 08-00533—Robert J. Jonker, District Judge.

Argued: January 19, 2011

Decided and Filed:  May 27, 2011

Before:  SILER, GILMAN, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Karen M. Daley, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C.,
Livonia, Michigan, for Appellants.  Hugh M. Davis, Jr., CONSTITUTIONAL
LITIGATION ASSOCIATES, P.C., Detroit, Michigan, for Appellee.  **ON BRIEF:**
Karen M. Daley, CUMMINGS, MCCLOREY, DAVIS & ACHO, P.L.C., Livonia,
Michigan, for Appellants.  Hugh M. Davis, Jr., CONSTITUTIONAL LITIGATION
ASSOCIATES, P.C., Detroit, Michigan, for Appellee.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.  Plaintiff Kathryn ("Kitti") Bletz brought this action individually and as a representative of her deceased husband's estate, alleging that defendants Sergeant Travis Gribble and Deputy Brent Denny are liable under 42 U.S.C. § 1983 and Michigan state law for fatally shooting her husband in the Bletz family home and unlawfully restraining her during and following her husband's death.  The district court denied defendants' summary judgment motion, holding that defendants are not entitled to qualified immunity or state governmental immunity.  For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

On the evening of May 3, 2005, defendant Brent Denny, an Ionia County Deputy Sheriff, consulted a list of outstanding warrants for residents of the Village of Saranac, Michigan.  On the list was a bench warrant for Zachary Bletz, issued for his failure to appear at a March 2005 court hearing on misdemeanor drunk-driving charges.  The address listed on the bench warrant for Zachary in Saranac, Michigan, was also where Zachary's parents, Fred and Kitti Bletz, resided.

After confirming with the Grand Rapids Police Department that the warrant remained outstanding, Denny joined defendant Travis Gribble, an Ionia County Deputy Sheriff Sergeant, at a Speedway gas station in Saranac.  Denny and Gribble decided to drive to the Bletz family residence to execute the warrant and effect Zachary's arrest.  Denny testified that he knew that Zachary's parents resided at the home.

The officers arrived at the Bletz home at approximately 11:40 p.m., and parked their separate, marked police vehicles thirty to thirty-five feet away from the entrance of the house.  Neither officer activated his police siren, and both turned off their

headlights as they pulled into the driveway. The house was dark, except for one "light or a TV or something" in a second-floor bedroom.

Both officers exited their respective vehicles and approached the rear side of the house where there was a porch entry and knocked on the door. Apparently, none of the residents heard the officers' knocking.[1] Zachary did, however, hear his dog barking loudly and went downstairs to investigate. When he reached the door, he saw the officers standing on the back lawn in close proximity to a breezeway on the southwest side of the home. Zachary, who was wearing shorts, a t-shirt, and slippers, exited the residence to speak with the officers. After identifying himself, Zachary was advised by Denny that the officers were there to arrest him pursuant to a bench warrant issued for his failure to appear. Defendants do not dispute that Zachary was cooperative.

Because Zachary was still wearing slippers, a discussion then took place between him and the officers about Zachary reentering the house to put on shoes to wear to jail. While Zachary testified that one of the officers ordered him to reenter the house to get shoes, Denny and Gribble claim that Zachary requested permission to go back inside and that they informed him he could only do so if they accompanied him into the home. Regardless, Zachary started to reenter the house through the breezeway, and the officers followed. According to Zachary, he tried to close the breezeway door behind him, but Denny forced the door open with his hand and gun. Zachary inquired whether the officers had a warrant, but neither Denny nor Gribble responded. Rather, the officers instructed Zachary to secure his dog for their safety.

As the officers waited in the breezeway leading into the house for Zachary to comply with their instructions, Denny observed a long-haired man standing to his left between the kitchen and dining room pointing a gun at him. Denny yelled "Gun!" and then crouched down in the corner of the breezeway. Gribble similarly took cover in the breezeway and yelled at the man, later identified as homeowner Fred Bletz, to "put the gun down!" or "put the f--king gun down!" According to Gribble, he also yelled

---

[1] Fred and Kitti were in bed when the officers arrived. Zachary was watching television in an upstairs bedroom.

"Sheriff's Department!" one time, but Denny, who also was in the breezeway, did not hear it. Denny also testified that he did not identify himself as a police officer. Regardless, Fred Bletz, who had poor vision and hearing, and was without his glasses or hearing aid, responded by repeatedly asking, "Who are you?"

When Fred Bletz did not promptly comply with Gribble's instructions to drop his weapon, Gribble fired four shots directly at the center mass of Fred's body, striking him one time. Fred Bletz died as a result of the gunshot wound. During the standoff, Fred Bletz did not fire any shots and, according to Zachary, was lowering his weapon at the time Gribble fired his weapon. Gribble claims, however, that Fred was pointing his gun directly at him when he fired. Officer Denny did not see any portion of the encounter, which lasted only six to ten seconds, because his face was "buried into a corner" of the breezeway.

Immediately following the shooting, Officers Gribble and Denny quickly moved into the house. Denny handcuffed Zachary, who was already lying face down on the kitchen floor, while Gribble kicked the decedent's unloaded gun out of his hand.[2] At that point, Kitti entered the dining room. Gribble ordered Kitti Bletz to the ground and instructed Denny to secure both her and Zachary. Denny then removed Zachary and Mrs. Bletz from the home and placed them, handcuffed, in separate locked police cars. Zachary was then arrested pursuant to the warrant. Mrs. Bletz, however, was not placed under arrest.

Both Mrs. Bletz and Zachary were cuffed and held in police custody for approximately three hours. At some point during their detainment, Mrs. Bletz and Zachary were transferred from defendants' patrol cars to state police cars. They were both released from police custody later that night.

This action was originally filed as two separate cases in Ionia County Circuit Court. The state court consolidated the actions, and defendants removed the consolidated case to the District Court for the Western District of Michigan. As the

---

[2]Fred's gun was not loaded, although there is no evidence that the officers knew it at the time.

personal representative of her husband's estate, and individually, Mrs. Bletz asserted claims against both officers under 42 U.S.C. § 1983 for violations of her and her deceased husband's Second, Fourth, Fifth, Eighth, and Fourteenth Amendment rights, and under state law for gross negligence, assault and battery of both herself and her deceased husband, false arrest, and false imprisonment. In addition, Mrs. Bletz asserted a bystander-liability claim based on her witnessing her husband's death.[3] Defendants moved for summary judgment, and Kitti cross-moved for summary judgment on her own individual Fourth Amendment and state-law tort claims.

On July 10, 2009, the district court denied Kitti's motion for summary judgment, and granted in part and denied in part defendants' motion. The district court dismissed all claims under the Fifth and Eighth Amendments, and Kitti's claim under the Second Amendment, because they had been abandoned by plaintiff. In addition, the district court dismissed the estate's Second Amendment claim, as well as both Fourteenth Amendment claims. The district court, however, determined that defendants were not entitled to qualified immunity on the Fourth Amendment claims. Similarly, the district court determined that defendants were not entitled to governmental immunity on the related state-law claims.

Defendants now timely appeal.

II.

In this appeal, defendants raise four arguments: (1) they are entitled to summary judgment and qualified immunity on the estate's Fourth Amendment claim; (2) they are entitled to summary judgment and qualified immunity on Kitti's Fourth Amendment claim; (3) they are entitled to summary judgment and governmental immunity on the estate's claim of gross negligence; and (4) they are entitled to summary judgment and governmental immunity on both the estate's and Kitti's intentional-tort claims. We address each argument in turn.

---

[3]Defendants failed to contest, separately, plaintiff's bystander-liability claim in their motion for summary judgment.

Plaintiff first claims that defendants are liable under § 1983 for violating her late husband's Fourth Amendment rights. Under § 1983, an individual may bring a private right of action against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution or conferred by federal statutes. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980). Defendants contend that they are entitled to summary judgment on plaintiff's § 1983 claims on the basis of qualified immunity. Generally, summary judgment based on qualified immunity is proper if the officer was not on notice that his conduct was clearly unlawful. *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002). However, if genuine issues of material fact exist as to whether the officer committed acts that would violate a clearly established right, then summary judgment is improper. *Poe v. Haydon*, 853 F.2d 418, 425-26 (6th Cir. 1988).

"We review the denial of summary judgment on grounds of qualified immunity *de novo* because application of this doctrine is a question of law." *McCloud v. Testa*, 97 F.3d 1536, 1541 (6th Cir. 1996). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation[.]" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "Through the use of qualified immunity, the law shields 'government officials performing discretionary functions . . . from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006).

In determining whether a defendant is entitled to qualified immunity, the court makes two inquiries: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right[,]" and (2) was the right "clearly established" to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*,

129 S. Ct. 808, 818 (2009). Although *Saucier* mandated that these questions be addressed in order, that requirement has since been relaxed. *See Pearson*, 129 S. Ct. at 818 ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").

> With regard to the second step,
>
> > [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 640 (citations omitted). *See Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) (quoting *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991)) ("In inquiring whether a constitutional right is clearly established, we must 'look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'"). "This standard requires the courts to examine the asserted right at a relatively high level of specificity[,]" and "on a fact-specific, case-by-case basis[.]" *Cope v. Heltsley*, 128 F.3d 452, 458-59 (6th Cir. 1997) (citations and internal quotation marks omitted).

Applying these principles, plaintiff attempts to satisfy her burden under the first prong of *Saucier* by arguing that there is evidence in the record that demonstrates the officers used excessive deadly force and thereby violated Fred's Fourth Amendment rights. In *Tennessee v. Garner*, the United States Supreme Court established that "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." 471 U.S. 1, 7 (1985). The Court explained that the reasonableness of the use of a particular level of force is evaluated by balancing "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* at 8 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)) (further citations

omitted).  The ultimate question is "whether the totality of the circumstances justified a particular sort of search or seizure." *Id*. at 8-9.  Necessarily then, even when probable cause to seize a suspect exists, "an officer may not always do so by killing him." *Id*. at 9.

Here, plaintiff contends that, upon examining the totality of the events on the night of the shooting, a reasonable jury could conclude that the officers' use of deadly force was objectively unreasonable.  Specifically, plaintiff argues that the officers' "actions in entering a darkened residence without announcing themselves in the middle of the night creates a material question of fact as to the reasonableness of the use of fatal force."  In support of her argument, plaintiff relies on *Yates v. City of Cleveland*, 941 F.2d 444 (6th Cir. 1991), a case also cited by the district court.

*Yates* is a § 1983 excessive-force case arising out of a police shooting where an officer entered a dark hallway at a private residence at approximately 2:45 a.m. without identifying himself, without shining a flashlight, and without wearing his hat, and an encounter leading to the use of deadly force ensued.  *Id*. at 445, 447.  The officer involved claimed that the occupants of the house "knocked him back through the door" of the residence, "and compelled him to draw his gun and fire because he felt vulnerable to attack."[4]  *Id.* at 445.  Yates offered a different version of the facts. According to Yates, after encountering the occupants who recognized him as a police officer, the officer "tripped on a warped floorboard while moving backward, and purposefully shot [Yates] while his hands were raised and after he said 'Don't Shoot.'" *Id.*

"Recognizing that these two versions presented a classic factual dispute, the *Yates* court held the reasonableness of the shooting was a jury question." *Chappell v. City of Cleveland,* 585 F.3d 901, 914 (6th Cir. 2009).  The court further noted "[i]n dictum . . . that '[a]n officer who intentionally enters a dark hallway in the entrance of a private residence in the middle of the night, and fails to give any indication of his

---

[4]"In his report on the incident, [the officer] stated that he was kicked, beaten in the face, and stomped on.  At the emergency room after the shooting, however, [the officer] was only treated for superficial scrapes on his knee and ankle." *Yates*, 941 F.2d at 446.

identity, is more than merely negligent.'" *Id.* (quoting *Yates*, 941 F.2d at 447). Plaintiff "view[s] this dictum as suggesting that unreasonable conduct by an officer in events leading up to the shooting may be a legitimate factor in assessing the reasonableness of the subsequent shooting." *Id*. at 915.

Whether events leading up to a shooting are legitimate factors to consider in assessing an excessive-force claim depends on the totality of the circumstances in question. *In Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397 (6th Cir. 2007), for example, this court analyzed an excessive-force claim in segments by "first identify[ing] the seizure at issue . . . and then examin[ing] whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances." *Id*. at 406 (citations and internal quotation marks omitted). The court in *Livermore* separated the actions of the defendant officer that occurred in the hours leading up to the fatal shooting from the "split-second judgments made immediately before the officer used allegedly excessive force." *Id*. at 407 (citations and internal quotation marks omitted).

A similar point was made by this court in *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996). In that case, the decedent's estate brought two § 1983 claims, alleging that the officers violated the knock-and-announce rule and that they used excessive force. Because the two § 1983 claims in *Dickerson* alleged different constitutional violations, the court analyzed them independently. *Id*. at 1162 ("[W]e analyze the § 1983 claims separately in this case. Although both claims are premised on Fourth Amendment violations, the violation of the knock and announce rule is conceptually distinct from the excessive force claim.").

"The time-frame is a crucial aspect of excessive force cases." *Id*. at 1161 (citation and internal quotation marks omitted). Where the events preceding the shooting occurred in close temporal proximity to the shooting, those events have been considered in analyzing whether excessive force was used. *See Claybrook v. Birchwell*, 274 F.3d 1098, 1103–04 (6th Cir. 2001) (acknowledging that excessive-force claims are viewed in temporal segments, but concluding that where "the evening's events are not

so easily divided[,]" *Dickerson* does not mandate that the court "look only at what occurred in the moments immediately" before the shooting); *Yates*, 941 F.2d at 447 (holding that an officer's actions were unreasonable under the Fourth Amendment where he "enter[ed] the dark hallway at 2:45 a.m. without identifying himself as a police officer, without shining a flashlight, and without wearing his hat" before shortly thereafter shooting the plaintiff); *Howser v. Anderson*, 150 F. App'x 533, 535 n.3 (6th Cir. 2005) (concluding that "because material disputes of fact exist with respect to both the striking of the decedent and the fatal shooting, segmentation would serve no useful purpose at [the summary judgment stage] of the proceedings because a fact-finder will have to resolve factual ambiguities with respect to both the striking and the shooting").

In the case before us, we need not decide precisely which preceding events (i.e., the breadth of the excessive-force segment) should properly be considered in analyzing the reasonableness of Gribble's use of deadly force. We can instead affirm the district court's denial of qualified immunity by looking only at the facts alleged by plaintiff in the moment immediately preceding the shooting. Zachary Bletz testified that Fred Bletz was lowering his gun in response to Gribble's command to do so. If Gribble shot Fred Bletz while the latter was complying with the officer's command, then Gribble violated Fred Bletz's clearly established Fourth Amendment right to be free from deadly force. *See Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006) (stating that the court has clearly established that a person has "a right not to be shot unless they are perceived as posing a threat to officers or others") (citing *Yates*, 941 F.2d at 447)). We can reach this conclusion without regard to the fact that the officers chose to execute a warrant in the middle of the night for a non-violent misdemeanor and entered the Bletz home, allegedly unannounced, in the dark to do so.

But defendants contend that they are entitled to qualified immunity on the estate's Fourth Amendment claims based on *Chappell v. City of Cleveland*. In *Chappell*, officers investigating an armed robbery suspected that the crime was committed by a local individual who had admitted to several similar robberies three months earlier. *Id.*

at 904. In the early hours of the next morning, after securing a search warrant, the officers entered the suspect's home. *Id*. at 904-05. The house was still dark, leading the police to proceed from room to room with flashlights and with their firearms drawn. *Id*. at 905. When they entered into a small bedroom, the officers spotted the suspect hiding in the closet. *Id*. at 905. The officers ordered him out. After first hesitating, the suspect came out of the closet holding a knife with the blade pointed upward. The suspect ignored the officers' commands to drop the knife and instead moved quickly towards them. Both officers fired at the suspect, killing him instantly. *Id.*

In denying summary judgment, the district court disregarded the officers' belief, under the circumstances, that the suspect posed a threat of serious physical harm. Instead, the court inferred that the suspect's actions could have reflected compliance. In reversing the district court and granting summary judgment, we held:

> At best, plaintiff has presented grounds for speculation that defendants misread her grandson's innocent intentions when he came out of the closet and advanced toward them with knife in hand. Yet, qualified immunity protects officers from liability for mistakes of law and fact. Plaintiff has failed to adduce facts demonstrating that defendants, in potentially misinterpreting McCloud's actions, were plainly incompetent or deliberately violated his rights when they acted in self-defense. Plaintiff has thus failed to carry her burden under the first prong of the qualified immunity analysis of demonstrating that defendants violated McCloud's constitutional rights.

*Id*. at 916.

There are, however, several key differences between the facts in *Chappell* and the instant case. In *Chappell*, the officers had certain knowledge that the suspect had engaged in prior armed robberies using a knife. Here, there was no imputation of past or potential future violence on the part of Fred. In *Chappell*, the officers were in a small room with no opportunity to retreat. Here, the officers were in a breezeway, only feet away from the outside and, arguably, safety. In *Chappell*, the subject had advanced to within five to seven feet and was apparently lunging forward with a knife. Here, Fred was fifteen feet away and was allegedly lowering his weapon.

Most importantly, in *Chappell*, "[n]one of [the] facts [were] refuted by physical or circumstantial evidence and none [were] disputed by contrary testimony. In fact, there [were] no other witnesses who could testify to the circumstances facing the detectives in the bedroom immediately before they fired their weapons." *Id*. at 910. In contrast, here, plaintiff's allegations rest not only on the eyewitness testimony of Zachary, but also on the differences of the testimony and actions of the two defendants. Thus, as in *Yates*, the district court's "ruling was driven by two obviously conflicting versions of the facts." *Id*. at 914-15. Given "that these two versions presented a classic factual dispute," the district court properly "held the reasonableness of the shooting was a jury question." *Id*. at 914. *See Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998) ("[S]ummary judgment is inappropriate where there are contentious factual disputes over the reasonableness of the use of deadly force."); *Chappell*, 585 F.3d at 909 (acknowledging that "*if* there is some evidence – more than a mere scintilla of evidence – that [an individual], through his conduct, judged from the perspective of reasonable officers on the scene, did not give the officers probable cause to believe that he posed a serious threat of harm, a genuine fact dispute is created.").

"Taken in the light most favorable to the party asserting the injury, . . . the facts alleged show [Gribble's] conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. Because Fred's right to be free from deadly police force while complying with police commands to disarm was clearly established, both *Saucier* prongs have been met. *Ciminillo*, 434 F.3d at 468 ("It was clearly established law in this Circuit at the time of the underlying events that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others."). Accordingly, we affirm the district court's decision to deny Gribble qualified immunity on the estate's Fourth Amendment claim.

However, we reverse the district court's decision denying Denny qualified immunity. "Under well-established Sixth Circuit precedent, a police officer may be responsible for another officer's use of excessive force if the officer '(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive

force, or (3) owed the victim a duty of protection against the use of excessive force.'" *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 347 (6th Cir. 2007) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)).  Neither of the first two categories is relevant here.  Deputy Denny did not discharge his weapon or use any other type of force against Fred, and he did not supervise Sergeant Gribble.

Although the third category is potentially applicable, *see, e.g.*, *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982), "[b]ecause the facts here establish that [Denny] lacked sufficient time to act to prevent [Gribble's] use of excessive force," the district court should have granted Denny summary judgment on this claim. *Murray-Ruhl,* 246 F. App'x at 347-48.  "Even if [Denny] was immediately able to perceive what was happening once the first shot was fired, he would not have had enough time to act to stop [Gribble] from shooting." *Id.* at 348. *See also Ontha v. Rutherford Cnty., Tenn.*, 222 F. App'x 498, 506 (6th Cir. 2007); *Gaudreault v. Municipality of Salem*, *Mass.*, 923 F.2d 203, 207 n.3 (1st Cir. 1990) ("A police officer cannot be held liable for failing to intercede if he has no 'realistic opportunity' to prevent an attack."); *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988) ("This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator.").  Moreover, the conclusion that summary judgment is proper for Denny is "reinforced by the plaintiff's lack of strenuous effort to maintain [this claim] against this defendant" on appeal. *Murray-Ruhl*, 246 F. App'x at 348.

III.

Mrs. Bletz, individually, also claims that her Fourth Amendment rights were violated by defendants' actions immediately following the fatal shooting.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV.  A "seizure" of an individual takes place when, "by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).  Here, it is indisputable that Kitti was seized within the

meaning of the Fourth Amendment when defendants handcuffed her and placed her inside a locked police vehicle. *See, e.g., Ingram v. City of Columbus*, 185 F.3d 579, 591 (6th Cir. 1999). It is also clear from defendants' statements that they seized Kitti not because they had probable cause or reasonable suspicion, but because they needed to secure the scene of the shooting and conduct an investigation.

Generally, the Fourth Amendment requires at least a "reasonable suspicion" that an individual has committed a crime before the individual may be seized. *See United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996); *Terry v. Ohio*, 392 U.S. 1, 21 (1968). However, even absent particularized reasonable suspicion, innocent bystanders may be temporarily detained where necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others. *See, e.g.*, *Michigan v. Summers*, 452 U.S. 692, 704-05 (1981).

In *Ingram*, we specifically addressed this "general right to detain without reasonable suspicion or probable cause[.]" 185 F.3d at 591 (capitalization and emphasis omitted). We noted that "[w]hile we have occasionally permitted the use of such tactics by officers to detain private individuals for investigative purposes, we have done so only where the officers making the seizures acted out of a justifiable fear of personal safety." *Id*. at 591-92. Moreover, it is expected that any detention under these circumstances would be "limited or routine[.]" *Id*. at 592; *see also Summers*, 452 U.S. at 705 n.21. Here, the officers may have been initially justified in detaining Kitti due to safety concerns. But, as the district court noted, "[w]hatever safety risk Defendants may initially have perceived, the risk surely dissipated as time went on and they secured the scene of the shooting and recovered Mr. Bletz's gun." Defendants fail to adequately explain why it was necessary to keep her both handcuffed and locked in the back of a police car for three hours when there was no evidence to suspect her of a crime or that she would present a continued safety risk.[5]

---

[5]Importantly, it should also be noted that the officers arrived at the Bletz home to execute an arrest warrant for a non-violent crime related to a failure to appear. They did not have a search warrant and took Zachary into custody immediately following the shooting.

Instead, defendants argue that they cannot be held liable for the entire three hours that Kitti was detained because she was transferred to the control of the Michigan State Police at some point of her detainment. Regardless of any transfer of control, police reports show that Kitti remained in defendants' direct control for a little over an hour. Based on the record before us, it is not clear why it was necessary to keep Kitti in custody for even this duration. Presumably, it took less than one hour for back-up to respond to the officers' call of a fatal shooting, thereby removing all legitimate safety concerns. As a result, we conclude that a reasonable jury could find that Kitti's detention by defendants for approximately one hour was objectively unreasonable, and thus a violation of her Fourth Amendment rights. *See Muehler v. Mena*, 544 U.S. 93, 103 (2005) (Kennedy, J., concurring) (noting that, even if the initial handcuffing of a person is objectively reasonable, the Fourth Amendment requires that the cuffs "be removed if, at any point during the search, it would be readily apparent to an objectively reasonable officer that removing the handcuffs would not compromise the officers' safety or risk interference or substantial delay in the execution of the search"); *see also Binay v. Bettendorf*, 601 F.3d 640, 653-54 (6th Cir. 2010).

Defendants next argue that "[e]ven if this Court were to conclude that handcuffing and detaining Mrs. Bletz was a violation of her Fourth Amendment rights, the contours of the right were not sufficiently clear that a reasonable officer would have understood that what he was doing violated that right." We disagree. "[I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself." *Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988). Yet, to be "clearly established" there need not be a prior case deciding that "the very action in question has previously been held unlawful[.]" *Anderson*, 483 U.S. at 640. In *McCloud*, we noted that if courts required prior precedent on the specific facts at issue in the pending case, "qualified immunity would be converted into a nearly absolute barrier to recovering damages against an individual government actor . . . ." 97 F.3d at 1556. "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law

may apply with obvious clarity to the specific conduct in question . . . ."  *United States v. Lanier*, 520 U.S. 259, 271 (1997).

Law enforcement officers were fairly on notice regarding the constitutional violations inherent in subjecting an innocent bystander to a detention that was excessive both in duration and in the manner it was carried out.  *See Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001) ("This court has held that the right to be free from excessive force is a clearly established Fourth Amendment right."); *see also Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)) ("[T]here need not be a case with the exact same fact pattern, or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional.").  Accordingly, we affirm the district court's decision to deny defendants summary judgment on Kitti's Fourth Amendment claim.

IV.

In Count I of her amended complaint, plaintiff claims that defendants' alleged use of excessive force constituted gross negligence, which is actionable under Mich. Comp. Laws § 691.1407.  Although establishing that a governmental official's conduct amounted to "gross negligence" is a prerequisite to avoiding that official's statutory governmental immunity, it is not an independent cause of action.  The only cause of action available to plaintiff for allegations of this nature would be for assault and battery. *See, e.g.*, *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004) ("Thus, plaintiff's claim of gross negligence is fully premised on her claim of excessive force. As defendants correctly note, this Court has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence.  Thus, plaintiff did not state a claim on which relief could be granted.") (citations omitted); *see also Livermore*, 476 F.3d at 408 (rejecting gross-negligence claim against an officer-defendant because it was "undoubtedly premised on the intentional tort of battery" where it was based on a shooting that resulted in death).  Therefore, the district court erred in

not dismissing plaintiff's state-law gross-negligence claim. As a result, we reverse the district court's decision to deny summary judgment on this claim.

V.

Next, we turn to plaintiff's intentional-tort claims, and defendants' asserted defense of governmental immunity. We review a district court's denial of governmental immunity on a motion for summary judgment de novo. *Dominguez v. Corr. Med. Servs*., 555 F.3d 543, 549 (6th Cir. 2009). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the district court's decision, we view all facts in a light most favorable to the non-moving party and draw inferences in favor of the non-movant. *Dominguez*, 555 F.3d at 549. We apply Michigan governmental-immunity law and federal procedural law to the issue. *Biegas v. Quickway Carriers, Inc*., 573 F.3d 365, 374 (6th Cir. 2009).

A.

Plaintiff first alleges that defendants are liable for assault and battery for shooting Fred. "Under Michigan law an assault is 'an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery.'" *Grawey v. Drury*, 567 F.3d 302, 315 (6th Cir. 2009) (quoting *People v. Nickens*, 685 N.W.2d 657, 661 (Mich. 2004)). A battery is defined as "'an unintentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person.'" *Id*.

In *Odom v. Wayne County*, 760 N.W.2d 217, 228 (Mich. 2008), the Michigan Supreme Court stated that the proper method for determining whether governmental immunity applies to intentional torts, such as assault and battery, is to apply the test set forth in *Ross v. Consumers Power Co.*, 363 N.W.2d 641, 647 (Mich. 1984). Under the *Ross* test, an employee enjoys a right to immunity if (1) the employee undertook the challenged acts during the course of his employment and was acting, or reasonably believed that he was acting, within the scope of his authority; (2) the employee

undertook the challenged acts in good faith or without malice; and (3) the acts were discretionary, rather than ministerial, in nature. *Odom*, 760 N.W.2d at 228. Defendants bear the burden of establishing their entitlement to immunity from plaintiff's state-law claims. *Id.* at 227-28.

In the present case, plaintiff does not challenge that defendants satisfy the first and third factors of the *Ross* test. The only issue in dispute is whether defendants were acting in good faith when they entered the Bletz home and Gribble shot Fred. Unlike qualified immunity under federal law, which uses an objective standard, "[t]he good-faith element of the *Ross* test is subjective in nature. It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Id.* at 229. Therefore, "[t]he proponent of individual immunity must establish that he acted without malice." *Id.* at 225. *See also Miller v. Sanilac Cnty*, 606 F.3d 240, 254 (6th Cir. 2010) (applying Michigan law) ("The only factor at issue here is 'good faith,' which is defined as 'without malice.'").

Viewing the evidence in a light most favorable to plaintiff, a reasonable jury would not be able to conclude that defendants acted in bad faith. Here, Gribble testified that he fired at Fred only because he was in fear for his life and the life of Denny. Although Zachary testified that Fred was lowering his weapon when Gribble fired, it is undisputed that Fred pointed a gun in the direction of the officers and may have initially ignored Gribble's order to drop his weapon. Accordingly, the record evidence does not support a finding that Gribble possessed a malicious intent when he shot and killed Fred. We therefore hold that Gribble's actions meet Michigan's subjective standard of good faith and that the district court erred in deciding otherwise.

Moreover, Denny's only involvement in the shooting of Fred was yelling "Gun!" when he saw the weapon in Fred's hand. There is no dispute that Fred had a gun in his hand at that time, so Denny's actions were clearly reasonable. Accordingly, both Gribble and Denny are entitled to governmental immunity on Fred's claim of assault and

battery. We therefore reverse the district court's decision denying defendants summary judgment on the estate's intentional-tort claim.

## B.

Kitti next alleges that defendants are liable under Michigan law for assault and battery, false arrest, and false imprisonment for their treatment of her following the shooting. To prevail on a false-arrest claim, Kitti must show that defendants "participated in an illegal and unjustified arrest, and that [the defendants] lacked probable cause to do so." *Walsh v. Taylor*, 689 N.W.2d 506, 513 (Mich. Ct. App. 2004). "The elements of false imprisonment are (1) an act committed with the intention of confining another, (2) the act directly or indirectly results in such confinement, and (3) the person confined is conscious of his confinement." *Id.* at 514 (citations and internal quotation marks omitted). False imprisonment also requires that "[t]he restraint . . . occurred without probable cause to support it." *Id.*

Here, there is absolutely no evidence in the record to suggest that either officer acted with malice when they took Kitti into custody. Although the officers may have been objectively unreasonable in holding Kitti in their custody for approximately one hour, and police custody for three hours, there is no reason to believe that they acted in bad faith under Michigan's subjective standard. Indeed, their stated reason for detaining Kitti, i.e., to secure the scene and ensure their safety, is clearly plausible given the circumstances. Accordingly, defendants are entitled to governmental immunity regarding Kitti's intentional-tort claims. We therefore reverse the decision of the district court denying defendants summary judgment on Kitti's state-law claims of assault and battery, false arrest, and false imprisonment.

## VI.

For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.