NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0403n.06

Case No. 23-3924

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

CLAUDE COLEMAN,

    Defendant-Appellant.

</td><td>

)
)
)
)
)
)
)
)
)
)

</td><td>

**FILED**
Aug 18, 2025
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

</td></tr>
</table>

Before: SUTTON, Chief Judge; STRANCH and RITZ, Circuit Judges.

SUTTON, Chief Judge. Late on a May evening in Cleveland, officers approached a man drinking alcohol on a sidewalk in violation of the city's open container law. He and one other man were directly next to a running car with two occupants. Several officers approached the four individuals and engaged with them. At the same time, Officer Friedrich Kaufmann peered into the window of the car and saw marijuana in an open backpack on the backseat. Officers arrested the driver, Claude Coleman, and discovered a firearm along with several types of drugs. Coleman argues that the district court should have suppressed the evidence found in the car because the police wrongfully seized him under the Fourth Amendment. He also challenges various evidentiary decisions made at trial along with his career offender designation at sentencing. We affirm.

I.

Just after midnight on May 22, 2021, officers from the Cleveland Police Department patrolled Gooding Avenue, a one-way street in the Fifth District of Cleveland. Officers drove the wrong way down the one-way street, hoping to catch potential wrongdoers off-guard. They spotted a man standing near a running parked car with an open container of alcohol, a violation of Cleveland's municipal code. He and another individual were "milling around [the] parked vehicle." R.168 at 28–29. The vehicle's driver's side window was open.

The officers parked in front of the running car, approached the two pedestrians on foot, and began to frisk them. Twenty seconds after parking, Officer Friedrich Kaufmann walked by the car, peered into the rear driver's side window, and noticed an open backpack in the backseat with a jar of marijuana in it. While the other officers frisked the pedestrians on the sidewalk, Officer Kaufmann asked Coleman through his open driver's side window: "What's up bro? Hey, do me a favor. Step out for me. Put your hand right up on the—" Kaufmann Video at 0:01:04–:11. Coleman interrupted Kaufmann by opening his car door and sprinting away; the officers tackled and handcuffed him.

Officers walked back to Coleman's car. Kaufmann told another officer that "there's some s**t in this backpack right here. That's what I was pulling him out for." Kaufmann Video 0:02:45–:50. Police opened the back driver's side door and found methamphetamine and two jars of marijuana in the open backpack. They also discovered a gun, crack cocaine, and fentanyl.

A grand jury indicted Coleman for two counts of drug trafficking, 21 U.S.C. § 841(a)(1) and (b)(1)(C), possession of a firearm by a felon, 18 U.S.C. § 922(g)(1), and use of a firearm during drug trafficking, *id.* § 924(c)(1)(A)(i). The district court denied Coleman's motion to suppress the evidence taken from the car. Coleman went to trial, and a jury convicted him on all counts.

At sentencing, the district court treated Coleman as a career offender based on his prior Ohio aggravated robbery and drug trafficking convictions. *See* Ohio Rev. Code §§ 2911.01(A)(1), 2925.03(A)(2). The court calculated a Guidelines range of 360 months to life and sentenced him to 360 months.

On appeal, Coleman challenges the admission of the evidence seized from his car, several evidentiary decisions at trial, and his designation as a career offender at sentencing.

II.

*Suppression motion.* Did the police unlawfully seize Coleman under the Fourth Amendment when they pulled in front of his parked car? No.

In assessing the denial of a suppression motion, we give clear-error review to the district court's factual findings and fresh review to its legal conclusions. *United States v. Stevenson*, 43 F.4th 641, 644 (6th Cir. 2022). We draw all evidentiary inferences in favor of the prevailing party below, in this instance the government. *United States v. Pyles*, 904 F.3d 422, 425 (6th Cir. 2018).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. All of the circumstances of a search—the "totality" of them, it's often said—inform whether it is reasonable. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). To arrest a suspect, officers must have probable cause to believe that the individual committed a crime. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). To stop and frisk a suspect, officers must have reasonable suspicion of criminal conduct. *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968).

In addition, an officer may protect himself by temporarily detaining "innocent bystanders" where "necessary to secure the scene of a valid search or arrest." *Bletz v. Gribble*, 641 F.3d 743, 755 (6th Cir. 2011). That necessity-driven authority, however, does not amount to a free-ranging

license to seize the unsuspected and unsuspecting. The officer must act "out of a justifiable fear of personal safety," and any detention must be "limited or routine." *Id.* (quoting *Ingram v. City of Columbus*, 185 F.3d 579, 591–92 (6th Cir. 1999)). These parameters ensure that only the "exigencies of the situation"—a health emergency, the risk of evidence destruction, officer safety—make a limited seizure imperative. *United States v. Johnson*, No. 23-3099, 2024 WL 1956209, at *2 (6th Cir. May 3, 2024) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)).

The "risk of harm to both the police and [others] is minimized" when officers take steps to secure the scene or otherwise take "command of the situation" while investigating criminal activity. *Michigan v. Summers*, 452 U.S. 692, 702–03 (1981). Hence, an officer who pulls a driver over for a traffic violation may ask the passengers to exit too. *Maryland v. Wilson*, 519 U.S. 408, 413–15 (1997). Even though the passengers aren't behind the wheel and even though a traffic violation rarely amounts to a violent crime, a brief detention prevents "sudden violence or frantic efforts to conceal" evidence. *Id.* at 414 (quotation omitted). An officer searching a home for an armed suspect likewise may detain its occupants to prevent flight and minimize other risks to officer safety. *Muehler v. Mena*, 544 U.S. 93, 98–99 (2005).

Even when officers justifiably fear for their safety, the detention of a bystander must be reasonable in scope and duration. *Summers*, 452 U.S. at 705 & n.21. An officer thus may not continue to detain innocent bystanders well after officers have secured the crime scene, *Bletz*, 641 F.3d at 755, and an officer may not handcuff the occupants of a home while arresting a suspect absent a sign of danger. *Ingram*, 185 F.3d at 592. But an officer searching a home may, by contrast, conduct a "routine detention" of its occupants. *Summers*, 452 U.S. at 705 n.21.

4

By these lights and under these circumstances, the officers justifiably detained Coleman. The City of Cleveland bans people from possessing "opened container[s] of" "intoxicating liquor" in a public place. Cleveland Mun. Code. § 617.07(b)(3). When the officers pulled down Gooding Avenue, they "almost immediately" saw a man with an open container of alcohol standing next to Coleman's car. That violation of a local law gave the police probable cause to seize him. *Whren v. United States*, 517 U.S. 806, 813, 819 (1996).

In securing the scene, the officers also reasonably seized Coleman for a brief period of time. *First*, the officers acted out of a justifiable concern for personal safety. Cleveland's Violent Crime Reduction Program had designated this District as one of the City's most dangerous neighborhoods. Officer Kopchak recalled that the area "le[d] the city in shootings." R.37 at 8. There were "so many homicides" by Gooding Avenue—at least 12 in the last four to five years— that he didn't remember how many people had been killed there. R.37 at 8–10. But he did remember the constant press of detectives who entered the area to seize firearms and narcotics, often from individuals connected to violent gangs.

Making the general more specific, officers had received "shots fired" reports two years before the search at the same "address where this very incident took place." R.27 at 15, 36–37. Two weeks earlier, they recovered a firearm and marijuana "three or four houses down" from where Coleman sat. R.37 at 14–15. And Coleman's car sat next to a memorial for a man who others had robbed and killed years earlier. The officers' knowledge of these criminal acts at that specific location made Coleman's presence—at midnight, in a car, in a part of town all agree was dangerous—"especially fraught." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983). The officers legitimately acted with commensurate caution when conducting activities in the area.

5

Other features of the encounter further justified the officers' safety concerns. When officers seized Coleman, he was sitting in a car within arm's reach of a suspect the officers were actively frisking. It was dark, and the police could not initially see into Coleman's vehicle. That reality compounded the already "inordinate risk confronting" the officers as they "approache[d] a person seated in an automobile." *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977). Given the circumstances, officers justifiably seized Coleman to secure the scene and protect their safety.

*Second*, the officers conducted a very limited detention. When they turned onto Gooding Avenue, they "almost immediately" saw a man with an open container and got out of their cars to investigate. R.37 at 29. Officer Kaufmann detained Coleman and his car no more than 20 seconds before he saw the marijuana in the backseat and asked him to exit. That brief seizure, used by the officer to "check[ his] surroundings" and "look[] into the vehicle," R.37 at 25, constitutes the kind of "limited" detention officers may conduct out "of a justifiable fear of personal safety," *Bletz*, 641 F.3d at 755 (quotation mark omitted).

Coleman's detention fits within the principle that police officers may, as a precaution, ask a passenger to exit a car when investigating its driver. *Wilson*, 519 U.S. at 413–15. Yes, the officers in this instance stopped a driver (Coleman) while investigating a crime by an adjacent bystander. But the officer-safety risks remain similar because an "occupant of [a] vehicle" next to an officer "increases the possible sources of harm to" him. *Id.* at 413. Those officers "can't see what anyone" inside a car is doing "from the shoulders down." R.37 at 32–33. The same officer-safety principles that give an officer authority to secure passengers in a car suspected of violating the traffic laws apply when a suspect stands right next to a car and engages with passengers inside.

During that brief spell, the officers obtained probable cause to arrest Coleman. Officer Kaufmann walked by Coleman's vehicle and saw marijuana in plain view, supplying probable

cause to arrest him for possessing controlled substances. *Maryland v. King*, 569 U.S. 435, 449 (2013); *United States v. Marxen*, 410 F.3d 326, 332 (6th Cir. 2005). That allowed the officers to order Coleman out of the car and search the vehicle for other evidence of crime. *Arizona v. Gant*, 556 U.S. 332, 343 (2009).

Coleman's responses fall short. Coleman claims that the investigation of an open-container violation did not require the officers to detain the three adjacent individuals. His case thus differs, he claims, from the officer-safety risks at issue in cases like *Muehler v. Mena*, 544 U.S. 93 (2005), where the officers handcuffed occupants of a home while searching for a shooter. The risks to officer safety differ in the two situations, to be sure. But so, too, does the nature of the initial detention here—quite brief and without handcuffs. At the same time, the officers here had an on-the-ground basis for exercising care. Just recently, they had uncovered a gun from an address near where they found Coleman. The officers in the past had received "several calls" about "shots fired" on that same street. R. at 15. And a dozen homicides had occurred in the same area in recent memory.

*Bey v. Falk* does not undermine this conclusion. 946 F.3d 304 (6th Cir. 2019). There, we held that police officers lacked reasonable suspicion to detain a car's passengers. But in that case, the officers did not observe "any criminal, or even suspicious behavior" beyond three young men driving a minivan in a high-crime area at night. *Id.* at 313–15. Here, the officers permissibly stopped the pedestrians, one of whom was violating Cleveland's open container law. *See United States v. Smith*, 140 F.4th 316, 320 (6th Cir. 2025).

Coleman maintains that the officer-safety justification does not apply because the officers first seized him when they drove the wrong way down a one-way street, before they knew about the open-container violation. As an initial matter, however, that is not how Coleman argued the

7

case below. He claimed in the trial court that the officers seized him when they "surrounded his vehicle and prevented him from leaving," all of which occurred after they saw the violation. R.20 at 4; R25 at 1. His new theory, at any rate, requires evidence he never introduced. To establish a seizure, Coleman would have to show that "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). So, Coleman's new claim would require knowing the distance between his car and the intersection, information he never presented below and could not even estimate in his appellate briefs or at oral argument. That leaves us only with this evidence—that the officers "almost immediately" observed the open-container violation after they turned down the street, suggesting the distance from the intersection to Coleman's car was short. R.37 at 29. On this record, the officers fairly stopped Coleman.

Coleman next contends that, even if the officers were justified in initially detaining him, the officers lacked probable cause to arrest him. Not so. Even assuming an arrest occurred when the officers asked Coleman to exit the car, as opposed to when they handcuffed him after his attempted flight, officers had probable cause based on the plain-view sighting of marijuana. *King*, 569 U.S. at 449; *Marxen*, 410 F.3d at 332.

Coleman counters that the district court clearly erred when it found that the officers saw the marijuana in his backseat. Not so again. The court supported its conclusion by crediting Officer Kaufmann's testimony. We have held that, for clear error purposes, such testimony standing alone suffices "to establish that the [incriminating evidence] was visible from outside the car." *United States v. Galaviz*, 645 F.3d 347, 356–57 (6th Cir. 2011). Contemporaneous evidence, moreover, corroborates Kaufmann's account. Before the officers searched the car, the body camera footage captured Kaufmann saying, "There's some s**t in this backpack right here. That's what I was pulling him out for." R.40 at 5. No clear error occurred.

*United States v. Loines* does not change matters either. 56 F.4th 1099 (6th Cir. 2023). We found clear error only because the government's photographs of the car's interior *contradicted* the officer's testimony, making it impossible that the officer saw contraband. *Id.* at 1107–08.

### III.

*Evidentiary rulings*. Do any evidentiary errors require a new trial? No.

Coleman argues that the district court abused its discretion by allowing the government to cross-examine him beyond the scope of his direct examination about the body camera footage, and by allowing the government to use his prior convictions as proof that he knew how to make crack cocaine. Rule 611(b) of the Federal Rules of Evidence limits cross-examination to "the subject matter of the direct examination and matters affecting the witness's credibility." We assess whether the "elicited testimony" was "reasonably related to the inferences drawn from" testimony elicited on direct examination. *United States v. Moore*, 917 F.2d 215, 222 (6th Cir. 1990).

The government's cross-examination reasonably related to Coleman's testimony. At trial, Coleman answered the firearm charge by proposing that officers planted the firearm in his car. On direct examination, Coleman testified that he "was dumbfounded" when officers told him about finding the gun, "because there wasn't a gun in that car." R.169 at 218. He then introduced body camera footage of his surprised reaction when the officers found a weapon in the car. Coleman used this line of questioning to suggest that the officers planted the gun. Under these circumstances, the government had every right to use this same body camera footage to cross-examine Coleman about his theory.

Nor did the district court abuse its discretion when it allowed the government to use Coleman's prior drug trafficking convictions as evidence that Coleman knew how to cook crack cocaine. Coleman himself introduced these convictions on direct examination, which means he

cannot complain that their admission was error now. *Ohler v. United States*, 529 U.S. 753, 760 (2000).

Coleman separately argues that the government improperly used two officers, Officers Donald Kopchak and Friedrich Kaufmann, as opinion witnesses. He did not raise these challenges below and thus forfeited them. *United States v. Hall*, 20 F.4th 1085, 1103 (6th Cir. 2021). A party who forfeits an argument at trial "may obtain relief on appeal only if the error is 'plain' and 'affects substantial rights.'" *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc) (quoting Fed. R. Crim. P. 52(b)). Neither of the district court's decisions rises to this level.

The Federal Evidence Rules permit reliable and helpful opinion testimony from an expert, so long as the expert does not opine on whether a criminal defendant's mental state satisfies "an element of the crime charged or of a defense." Fed. R. Evid. 702, 704. An expert opinion satisfies these requirements if it turns on the witness's training and experience, aids the juror in determining a relevant fact, and is based on the reliable application of reliable facts, data, and methodology. *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016). The Criminal Rules require the government to disclose such opinions to the defendant. Fed. R. Crim. P. 16(a)(1)(G).

The district court did not err, let alone plainly err, in admitting Officer Kopchak's testimony that the drug quantities were "more consistent with drug trafficking" than "personal use." R.169 at 74. As for the Evidence Rules, Kopchak's testimony was based on his training and experience as a police officer. His testimony also helped the jury, as it tended to undermine Coleman's "personal use" defense. We have regularly permitted officers to give their opinion on whether drug quantities suggest trafficking rather than personal use. *See, e.g.*, *United States v. Ham*, 628 F.3d 801, 805 (6th Cir. 2011); *Hall*, 20 F.4th at 1103–04. As for the Criminal Rules,

the government provided Coleman notice that Kopchak would testify about drug use and drug trafficking.

Neither did the district court exceed its discretion when it admitted Officer Kaufmann's undisclosed opinion testimony. Even conceding that the government should have disclosed this testimony under Criminal Rule 16, Coleman has not "show[n] how the outcome of the case would have been different had he received notice." *Ham*, 628 F.3d at 806 (quotation omitted). Kaufmann's testimony covered the same topics as Kopchak's: whether the volume of drugs suggested personal use or trafficking. The testimony placed Coleman on notice of the potential questions that an officer could answer. Confirming the point, Coleman's counsel was prepared for this line of testimony. He cross-examined Kaufmann about typical drug quantities, about how the wrapping differs when drugs are for personal use or distribution, and about the settings in which various drugs are used. Kaufmann's testimony, moreover, "merely corroborated" other evidence, including Kopchak's extensive testimony on the distinction between the volume of drugs consistent with personal use and that consistent with distribution, making any error harmless. *United States v. Agrawal*, 97 F.4th 421, 429 (6th Cir. 2024).

The district court also did not plainly err when it failed to give a cautionary instruction about Kaufmann's testimony. We have previously held that such an error is not plain so long as "the jurors had the tools for properly evaluating the opinions," such as another witness's "testimony." *United States v. Pritchett*, 749 F.3d 417, 430 (6th Cir. 2014). Kopchak's testimony amply supported Kaufmann's opinions about the distribution quantity of the drugs.

Coleman separately contends that the district court improperly instructed the jury that the government established his intent to distribute drugs when it rejected his request for a third cross

11

examination of Officer Kopchak based on his testimony. After Coleman asked to cross-examine

Kopchak to bolster his personal-use defense, the district court stated:

> No, we've had enough. I've given you leeway. No. Have a seat. That issue is clear. There has been testimony to that effect, in a number of witnesses, that there was no evidence in the car of personal use of the drugs as described. It's not a matter in dispute. Thank you. You can step down.

R.169 at 155–56. Coleman did not raise this challenge before the district court. The parties dispute

whether we should review Coleman's challenge for plain error as a forfeited due-process claim or

with fresh eyes as an Evidence Rule 605 claim. His argument fails under either standard.

*United States v. Johnson* sets the rule. 803 F.3d 279, 284 (6th Cir. 2015). There, a district

court, on cross-examination, stated that "based upon the testimony of this witness, both of these

weapons crossed state lines and were in interstate commerce." *Id.* (quotation and emphasis

omitted). We said that this offhand comment did not constitute plain error because the district

court did not "*instruct*[] the jury that an element of the crime had been established." *Id.* (emphasis

in original). And we noted that the comment did not affect the defendant's substantial rights

because the district court clarified to the jury that "[d]eciding what the facts are is your job, not

mine." *Id.* (alteration in original) (quotation omitted).

Here, too, the district court did not err because its comment was not an instruction to the

jury but an explanation to counsel for why it cut cross-examination short. And this explanation

did not infringe on the defendant's substantial rights because the court later instructed the jury that

it must decide whether Coleman's possession was for distribution or personal use based on the

evidence. The court also instructed the jury that its "comments and questions are not evidence."

R.170 at 66. "[J]uries are presumed to follow their instructions." *Zafiro v. United States*, 506 U.S.

534, 540 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). No reversible error

occurred.

IV.

*Sentencing*. Did the district court err in treating Coleman as a career offender under the Guidelines? No.

The Sentencing Guidelines set a higher base offense level for a defendant who, having committed at least two prior violent or drug felonies, commits another violent crime. U.S.S.G. § 4B1.1(b)(4). A "crime of violence" includes several enumerated offenses. *Id.* § 4B1.2(a). We assess whether the targeted crime's elements are "the same as, or narrower than," the enumerated offense's elements. *Descamps v. United States*, 570 U.S. 254, 257 (2013). Sometimes a state defines its crime in a "divisible" way, allowing a defendant to commit a crime by satisfying one of several combinations of elements. *Id.* For these crimes, we look to state charging documents to compare the actual elements of the conviction with the enumerated offense's elements. *Id.*

Ohio law permits prosecutors to charge "aggravated robbery with a deadly weapon" if they believe the defendant committed any one of 31 predicate "theft offenses." *United States v. Ivy*, 93 F.4th 937, 943 (6th Cir. 2024). The indictment in this instance specifies that prosecutors charged Coleman with a "theft offense, as defined in Section 2913.01 and 2913.02" of the Ohio Revised Code. R.146-1 at 1. The first section (§ 2913.01) lists a wide range of "theft offense[s]," and the second section (§ 2913.02) describes the features of one specific offense of "Theft." Ohio Rev. Code §§ 2913.01, 2913.02. Taking the two statutory references together, Coleman's charging documents thus clarify his theft offense: "aggravated robbery with a deadly weapon" by means of "theft." *See also United States v. Mandela*, No. 24-3718, 2025 WL 2181485, at *3–4 (6th Cir. Aug. 1, 2025); *United States v. Rice*, No. 23-3771, 2024 WL 3898564, at *4 (6th Cir. Aug. 22, 2024).

"Aggravated robbery with a deadly weapon" by means of theft is a categorical match to the Guidelines offense of actual or attempted "extortion." The Guidelines offense of extortion criminalizes "obtaining something of value from another by the wrongful use of (A) force, (B) fear of physical injury, or (C) threat of physical injury." U.S.S.G. § 4B1.2(a)(2), (d), (e)(2). The relevant state crime proscribes displaying, brandishing, or using "a deadly weapon," while committing or attempting to commit "theft." Ohio Rev. Code §§ 2911.01(A)(1), 2913.02(A).

Consider each feature of extortion and its match with each feature of the Ohio theft offense. Start with the first element of extortion under the Guidelines: "obtaining something of value from another." Ohio's "Theft" statute provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services" of another in any one of five specified ways. Ohio Rev. Code § 2913.02(A). Depriving someone of their property or services parallels "obtaining something of value" from that person. *See United States v. Carter*, 69 F.4th 361, 364 (6th Cir. 2023), *abrogated on other grounds by United States v. Cervenak*, 135 F.4th 311 (6th Cir. 2025) (en banc).

Turn to the second element of extortion under the Guidelines: "the wrongful use of (A) force, (B) fear of physical injury, or (C) threat of physical injury." Coleman's aggravated robbery under Ohio law requires displaying, brandishing, or using a dangerous weapon. Ohio Rev. Code § 2911.01. Using a dangerous weapon satisfies the wrongful use of force element in extortion.

Coleman's aggravated robbery conviction in the end required Ohio prosecutors to prove the elements of federal extortion. *See Descamps*, 570 U.S. at 257. That qualifies Coleman as a career offender.

*United States v. Ivy* does not change matters. 93 F.4th 937. There, the defendant's charging documents did not specify the "theft offense" with which he was charged. *Id.* at 947–48. They

14

mentioned only Ohio Rev. Code § 2913.01 and did not, as here, include the illuminating addition of Ohio Rev. Code § 2913.02. *Id.* at 943. Under the categorical approach, we had to presume the least culpable conduct, which did not satisfy the "obtaining something of value" prong. *Id.* at 946. Here, we know that the predicate offense is "theft," a crime that requires "obtaining something of value."

Coleman points out that an aggravated robbery could be committed by deception, which falls outside the Guidelines requirement of "the wrongful use of" actual, feared, or threatened force for extortion. But Coleman ignores another element—that Ohio's prosecutors had to prove that he used, brandished, or displayed a deadly weapon. It stretches credulity to imagine an aggravated robber using a weapon to steal from someone in a way that does not involve actual, feared, or threatened force. We need not entertain such "legal imagination" when the statute's text makes it exceedingly unlikely that a crime could be committed in this way. *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007); *accord Cervenak*, 135 F.4th at 326–27; *id.* at 333–34 (Nalbandian, J., concurring in part); *id.* at 341 (Ritz, J., concurring in part); *id.* at 364–67 (Thapar, J., dissenting).

We affirm.